606 A.2d 265

**STATE of Maryland**

v.

**Ronald Lee RAINES and Lawrence Wayne Bentley.**

**No. 103, Sept. Term, 1991.**

Court of Appeals of Maryland.

May 14, 1992.

584

Kathryn Grill Graeff, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., both on brief) Baltimore, for petitioner.

José Felipé Anderson, Asst. Public Defender (Stephen E. Harris, Public Defender, both on brief) Baltimore, for respondents.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, McAULIFFE, CHASANOW, KARWACKI and ROBERT M. BELL, JJ.

KARWACKI, Judge.

Ronald Lee Raines and Lawrence Wayne Bentley, the respondents, were convicted at a bench trial in the Circuit

Court for Baltimore County of the first degree premeditated murder of Cynthia Southern. The questions we shall address are whether sufficient evidence was presented at trial to support the convictions of Raines, as a principal in the first degree, and Bentley, as a principal in the second degree, of that murder.

## I.

The events preceding the murder of Cynthia Southern began on the morning of January 7, 1990, when Bentley went to his father's home and took his father's .32 caliber automatic pistol to have it refinished for him as a belated Christmas gift. Bentley placed the pistol in his pick-up truck and then proceeded to meet Raines at about 11:30 a.m. The pair visited a few bars where they drank beer.

As Bentley was driving from a bar in Sykesville, Raines grabbed the pistol and fired it at a passing automobile. Bentley then drove the truck back to the bar that he and Raines had just left, and Raines fired a shot through the window of the bar. Bentley then headed for Ellicott City where Raines fired a shot into the home of an acquaintance, Hymie Kelley.

Raines and Bentley next went to the Eight Mile House bar on Frederick Road outside of Ellicott City. After playing pool and drinking beer, Bentley and Raines left and proceeded to the Baltimore beltway, where Bentley drove north towards Towson. As Bentley was passing a tractor-trailer, Raines, after announcing that he was going to shoot at the tires of the tractor-trailer, discharged the pistol in the direction of the window on the operator's side of the cab of the tractor. The bullet shattered the window and struck Cynthia Southern, the tractor operator, in the head behind her left ear. She died shortly thereafter.

Joseph T. Fales was driving behind the tractor-trailer at approximately 7:40 p.m. Fales noticed a "puff or burst" come from the tractor-trailer, and he immediately thereafter drove through a pile of glass. The tractor-trailer swerved

on and off the highway before it finally collided with a guardrail and came to a stop. When Fales went to the cab of the tractor-trailer, he found the driver slumped over with a massive head wound behind her left ear. It was stipulated that the bullet that caused Southern's death came from the gun Raines fired.

Detective Philip G. Marll of the Baltimore County Police Department arrived at the scene sometime after midnight. Marll observed that the driver's side window of the tractor-trailer was broken out, and all the glass was gone. None of its tires were deflated.

Raines was subsequently arrested and made several statements to Detective Marll. Marll testified that Raines initially denied being on the Baltimore beltway that evening, but then stated that he was with Bentley when Bentley shot the tractor-trailer driver. Raines then gave a third statement where he admitted: "I lied. I shot the driver. I know I did it, but I don't remember doing it." Raines said that Bentley gave him the gun after they left the Eight Mile House bar. Marll testified that Raines said he remembered pointing the gun up at the truck, and he was going to shoot the tires and the top of the truck. Raines told Marll that his brother, Walter Raines, disposed of the gun by throwing it into the Patapsco River. The weapon was recovered from the river.

Marll then arrested Bentley. Bentley gave a chronology of the events which occurred on January 7. When asked about the shooting at Hymie Kelley's house, Bentley first denied it, and then he said that Raines fired the shot, and that the gun belonged to Raines. Bentley said that Raines showed a third person the gun and said that he, Raines, was going to kill Hymie Kelley. Bentley told Detective Marll that he and Raines went to the Eight Mile House bar at approximately six or seven o'clock. While Raines was shooting pool, Bentley saw the gun hanging out of the back of Raines's pants. Bentley took the gun and dropped it on the floor. Bentley then left the bar and put the gun in his truck. Bentley told Marll that Raines got in the truck and

took the gun. Bentley proceeded to drive to the beltway, heading toward Towson. As Bentley drove past the tractor-trailer, Raines pointed to the truck and said he was going to shoot the tractor-trailer's tires. As they passed the tractor-trailer, Bentley heard the gun go off, and he saw the tractor-trailer slow down and pull off to the side of the road. Bentley told Marll that he had wanted to stop, but Raines said no, "[I]t just went through the glass and through the cab." Bentley said that Raines threatened to shoot him, so he took Raines to a bar. Bentley slept in the car for several hours until Raines was ready to leave the bar. Bentley then drove Raines and a woman that Raines met at the bar to the woman's house where they spent the night. The next day Bentley and Raines learned that warrants had been issued for their arrest, and they left the state.

Raines and Bentley were charged in the Circuit Court for Baltimore County in the statutory form with the murder of Cynthia Southern and with the use of a handgun in the commission of that crime. Bentley testified on his own behalf at the trial. He again gave a chronology of the events of the day. He indicated, however, that he lied about one thing in his statement to Marll. Bentley stated that after Raines shot at the tractor-trailer, Raines did not say that the bullet went through the cab. Bentley testified that Raines had really said that he shot between two trucks.

Judge James T. Smith, Jr. convicted both Raines and Bentley of first degree murder and use of a handgun in the commission of a crime of violence. The trial court, in a lengthy oral opinion, found that Raines aimed and shot at the tractor-trailer window intentionally, deliberately and with premeditation. The court explained:

"Now, in this case, I don't just have his statement that he rolled the window down and he put the gun out and shot. I have the physical evidence as to where he shot by where the bullet ended up.

"Clearly, he aimed right at the driver's window, and he aimed at the driver's window in such a way that he was

bound to hit the driver of the vehicle, from the position where the bullet entered the victim's neck behind her left ear."

The trial judge further found that Bentley supplied Raines with the gun, knew that Raines had been shooting the gun all day and knew that Raines was going to shoot at the truck. Judge Smith sentenced both Raines and Bentley to life imprisonment for first degree murder and to concurrent five year terms for the handgun violation. All but thirty years of Bentley's sentence of life imprisonment was suspended.

Raines and Bentley appealed to the Court of Special Appeals, contending that the evidence was insufficient to support their convictions for first degree murder. The intermediate appellate court in an unreported opinion held that the evidence did not show a specific intent to kill on the part of either Raines or Bentley. Rather, the court concluded that the evidence did support a conviction for the "depraved heart" variety of second-degree murder. Consequently, the court reversed the convictions and sentences for first degree murder, directed that convictions of guilty to second degree murder be entered, and ordered that Raines and Bentley be resentenced accordingly. We granted the State's petition for certiorari to review that decision.

## II.

In reviewing the sufficiency of the evidence to support a criminal conviction, the standard to be applied is "whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 318, 99 S.Ct. 2781, 2788–89, 61 L.Ed.2d 560, 573 (1979) (footnote omitted), *quoted in McMillian v. State*, 325 Md. 272, 289, 600 A.2d 430, 438 (1992); *Reed v. State*, 316 Md. 521, 526, 560 A.2d 1104, 1106 (1989); *Johnson v. State*, 303 Md. 487, 510, 495 A.2d 1, 13 (1985), *cert. denied*, 474 U.S. 1093, 106 S.Ct. 868, 88 L.Ed.2d 907 (1986). The appropriate inquiry then is not whether we believe that the evidence at trial established guilt beyond a

reasonable doubt; "[i]nstead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. at 319, 99 S.Ct. at 2789, 61 L.Ed.2d at 573 (emphasis in original); *quoted in McMillian,* 325 Md. at 289–90, 600 A.2d at 438–39; *Webber v. State,* 320 Md. 238, 248, 577 A.2d 58, 63 (1990); *Tichnell v. State,* 287 Md. 695, 717, 415 A.2d 830, 842 (1980). Moreover, when evaluating the sufficiency of the evidence in a non-jury trial, the judgment of the trial court will not be set aside on the evidence unless clearly erroneous, giving due regard to the trial court's opportunity to judge the credibility of the witnesses. Md.Rule 8–131(c). *See Wilson v. State,* 319 Md. 530, 535, 573 A.2d 831, 833 (1990); *West v. State,* 312 Md. 197, 207, 539 A.2d 231, 235–36 (1988); *Dixon v. State,* 302 Md. 447, 450, 488 A.2d 962, 963 (1985). Within this scope of review, we separately consider whether the convictions of Raines and Bentley were adequately supported by the evidence.

### III.

■ Maryland Code (1957, 1992 Repl.Vol.) Art. 27, § 407 includes within its definition of first degree murder: "[A]ll murder which shall be perpetrated ... by any kind of wilful, deliberate and premeditated killing." We have explained:

"For a killing to be 'wilful' there must be a specific purpose and intent to kill; to be 'deliberate' there must be a full and conscious knowledge of the purpose to kill; and to be 'premeditated' the design to kill must have preceded the killing by an appreciable length of time, that is, time enough to be deliberate. It is unnecessary that the deliberation or premeditation shall have existed for any particular length of time."

*Tichnell v. State,* 287 Md. 695, 717–18, 415 A.2d 830, 842 (1980). *See Chisley v. State,* 202 Md. 87, 106, 95 A.2d 577, 585–86 (1953) (quoting L. Hochheimer, *The Law of Crimes*

*and Criminal Procedure* § 347 (1904)). However short the period between the intention and the act, if the killing results from a choice made as the consequence of thought, the crime is characterized as deliberate and premeditated murder. *Tichnell,* 287 Md. at 718, 415 A.2d at 842; *Chisley,* 202 Md. at 106–07, 95 A.2d at 586.

■ In the instant case, the trial court explicitly found that Raines shot at the tractor trailer window intentionally, deliberately, and with premeditation. In so finding, the trial court rejected the statement given to the police by Raines that he only intended to shoot at the tires and the top of the truck. The Court of Special Appeals made its own assessment of the testimony and decided otherwise. The court stated:

> "In his statement to the police, [Raines] said that he was aiming at the tires and at the top of the cab. The movement of the target, poor marksmanship, and alcohol can all explain the bullet's final resting place. Furthermore, all of the testimony as to intent supports a 'depraved heart' murder theory of the case. The testimony of the appellant Bentley and the statement of the appellant Raines indicate that there was no specific intent to kill."

This analysis indicates that the Court of Special Appeals credited the Raines's version of the events, one that necessarily mitigated his culpability. Of course, the credibility of the witnesses was a matter for the trial court, as fact finder, not the appellate court, to resolve. Md.Rule 8–131(c). *See Wilson v. State,* 319 Md. 530, 535, 573 A.2d 831, 833 (1990); *Brooks v. State,* 277 Md. 155, 162, 353 A.2d 217, 221 (1976); *Johnson and Carroll v. State,* 238 Md. 643, 644, 210 A.2d 399, 400 (1965) (per curiam); *McDowell v. State,* 231 Md. 205, 211, 189 A.2d 611, 614 (1963); *Weaver v. State,* 226 Md. 431, 436, 174 A.2d 76, 78 (1961). Furthermore, the determination of an accused's intention is, in the first instance, for the trial judge, when sitting without a jury, and this determination will not be disturbed on appeal unless clearly erroneous. *Taylor v. State,* 238 Md. 424, 433, 209

A.2d 595, 600 (1965). As noted, the trial court discounted Raines's version of the events. Instead, the court drew an inference based on other evidence offered at trial that the killing was intentional, deliberate and premeditated. This, the trial court, as fact finder, has the exclusive right to do. The Court of Special Appeals erred in conducting its own independent credibility analysis and in rejecting the trial court's finding of facts.

The fact that Raines did not admit that he shot the tractor-trailer driver with the intent to kill does not preclude his conviction of first degree murder. This Court has noted that the trier of fact may infer the intent to kill from the surrounding circumstances:

"[S]ince intent is subjective and, without the cooperation of the accused, cannot be directly and objectively proven, its presence must be shown by established facts which permit a proper inference of its existence."

*State v. Earp*, 319 Md. 156, 167, 571 A.2d 1227, 1233 (1990), *quoting Davis v. State*, 204 Md. 44, 51, 102 A.2d 816, 819 (1954). Therefore, intent must be determined by a consideration of the accused's acts, conduct and words. *Taylor*, 238 Md. at 433, 209 A.2d at 600. It is well established that under the proper circumstances, an intent to kill may be inferred from the use of a deadly weapon directed at a vital part of the human body. *Earp*, 319 Md. at 167, 571 A.2d at 1233; *Chisley*, 202 Md. at 105, 95 A.2d at 585.

In rejecting the trial court's finding that Raines shot at the truck intentionally, deliberately and with premeditation, the Court of Special Appeals cited *Smith v. State*, 41 Md.App. 277, 398 A.2d 426, *cert. denied*, 284 Md. 748 (1979). *Smith*, instead of negating the trial court's finding, actually supports it. In *Smith*, the evidence showed that Smith got into an argument with the victim at a bar. Smith left the bar, procured a shotgun from a nearby home and shot the victim immediately upon returning to the bar. Recognizing that the intent to kill may be inferred from the act of directing a dangerous weapon at a vital part of the human anatomy, the Court of Special Appeals held that, despite

Smith's claim that the gun went off accidentally, the jury legitimately could have concluded that the murder was wilful, deliberate and premeditated. *Id.* at 279–83, 398 A.2d at 429–31.

Similarly, in the present case, there was ample evidence to support the trial court's findings that the murder of Cynthia Southern was wilful, deliberate, and premeditated. The physical evidence revealed that the shot fired by Raines shattered the window on the driver's side of the tractor cab and then struck the victim, who was operating the tractor-trailer, in the head. This evidence supported the trial court's finding that Raines aimed and fired the pistol at the victim's head. *See Ferrell v. State,* 304 Md. 679, 684, 500 A.2d 1050, 1053 (1985) (from the facts that Ferrell used both hands to aim in dim light and shot each victim above the torso, a jury could infer that he aimed for the victims' heads and intended to kill each).

In reaching its decision in the instant case, the Court of Special Appeals relied in part upon the following passage on "depraved heart" murder from R. Gilbert & C. Moylan, *Maryland Criminal Law: Practice and Procedure* § 1.6-3., at 21 (1983):

"A classic example of the depraved heart killing is the shooting of a rifle into a passing passenger train with the result that a person on the train is slain. The same rationale would apply, of course, to shooting at vehicles on the highway."

There is a critical distinction between the facts of this case and the example of "depraved heart" murder given by the Court of Special Appeals. Where one shoots in the general direction of a passing passenger train or vehicle on the highway, a person may or may not be in the path of the bullet. On the other hand, Raines shot at the driver's window of a tractor-trailer being driven on a highway. He knew someone was behind the window. Raines's actions in directing the gun at the window, and therefore at the driver's head on the other side of the window, permitted an

inference that Raines shot the gun with the intent to kill. *See State v. Jenkins*, 307 Md. 501, 513–14, 515 A.2d 465, 471–72 (1986). Relying upon that inference, the trial judge could rationally find, beyond a reasonable doubt, that the killing was wilful, deliberate and premeditated so as to render Raines guilty of first degree murder.

Although a different trier of fact may have viewed the evidence as establishing second degree murder instead of first degree murder, the trial court's decision was not clearly erroneous. The Court of Special Appeals erred in substituting its judgment for that of the trial court on the evidence.

## IV.

Bentley challenges the sufficiency of the evidence to support his conviction of first degree murder as a principal in the second degree. The trial court found Bentley guilty, stating that he could be convicted as a principal in the second degree "provided he is a participant in the act, and in fact, he can be convicted whether he knew the Defendant, Ronald Raines, was going to shoot at the window or not." The Court of Special Appeals vacated Bentley's conviction, holding that he could not be convicted of first degree murder as a principal in the second degree without evidence that he harbored the specific intent to kill the victim.

A second degree principal must be either actually or constructively present at the commission of a criminal offense and aid, counsel, command, or encourage the principal in the first degree in the commission of that offense. *State v. Hawkins*, 326 Md. 270, 280, 604 A.2d 489, 495, (1992); *Johnson v. State*, 303 Md. 487, 510, 495 A.2d 1, 12 (1985), *cert. denied*, 474 U.S. 1093, 106 S.Ct. 868, 88 L.Ed.2d 907 (1986); *Pope v. State*, 284 Md. 309, 331, 396 A.2d 1054, 1067 (1979); *Ward v. State*, 284 Md. 189, 197, 396 A.2d 1041,

1046 (1978); *Vincent v. State,* 220 Md. 232, 239, 151 A.2d 898, 903 (1959).[1]

■ We have held that when a specific intent is a necessary element of a particular crime one cannot be a principal in the second degree to that offense unless such person entertained such an intent or knew that the principal in the first degree entertained such intent. In *Pope v. State,* 284 Md. 309, 396 A.2d 1054 (1979), Pope was convicted of child abuse. Demiko Lee Norris, three months old, died as a result of physical injuries inflicted by his mother, Melissa Vera Norris. The abuse by the mother occurred over a period of several hours on a Sunday morning at Pope's home and in her presence. Pope's involvement in the events leading to the child's abuse and death began on the preceding Friday evening when she, Melissa, and the child were returning home from church. Melissa Norris was acting strangely—her personality kept changing back and

---

1. We recently reviewed the classification of parties to a crime under the common law of this State in *State v. Hawkins,* 326 Md. 270, 604 A.2d 489 (1992). Judge Orth, speaking for the Court, there observed:
   "When a person embraces a misdemeanor, that person is a principal as to that crime, no matter what the nature of the involvement. In the field of felony, however, the common law divides guilty parties into principals and accessories. Principals are classified as in the first degree (perpetrators), or in the second degree (abettors—in times past, as accessories at the fact). Accessories are classified as before the fact (inciters) or after the fact (criminal protectors). *State v. Ward,* 284 Md. 189, 196, 396 A.2d 1041 (1978), *appeal after remand,* 290 Md. 76, 427 A.2d 1008 (1981).
   "'A *principal in the first degree* is one who actually commits a crime, either by his own hand, or by an inanimate agency, or by an innocent human agent. A *principal in the second degree* is one who is guilty of felony by reason of having aided, counseled, commanded or encouraged the commission thereof in his presence, either actual or constructive. An *accessory before the fact* is one who is guilty of felony by reason of having aided, counseled, commanded or encouraged the commission thereof, without having been present either actually or constructively at the moment of perpetration. An *accessory after the fact* is one who, with knowledge of the other's guilt, renders assistance to a felon in the effort to hinder his detection, arrest, trial or punishment.'
   "*Id.* [284 Md.] at 197 [396 A.2d 1041]."
   *Id.,* [326 Md.] at 280–81, 604 A.2d 489, 494–95.

forth from being her normal self to being caught up in a religious frenzy, thinking that she was God. Pope took Melissa and the child into her home for the night, and took care of the child when Melissa was not herself. Melissa's erratic behavior continued throughout the weekend and on Sunday morning, her voice and appearance suddenly changed again to 'God.' In her religious frenzy of apparent exorcism, Melissa physically abused her child, whom she insisted was possessed by the devil, until the child died. Pope looked on, but did nothing to prevent the abuse, and failed to seek medical assistance for the child. The trial court found Pope guilty of the crime of child abuse as a principal in the first degree, or alternatively, as a principal in the second degree.

On appeal, this Court reversed the conviction of Pope as a principal in the first degree, holding that the evidence was legally insufficient to prove that Pope fell within the class of persons to whom the child abuse statute, Md.Code (1957, 1976 Repl.Vol.) Article 27, § 35A, applied because she was neither the child's parent nor adoptive parent, and did not have permanent or temporary custody of the child.

As to Pope's conviction as a principal in the second degree, we reasoned:

"[Pope] would be a principal in the second degree if she aided or abetted in the commission of the crime. The principal in the second degree differs from the principal in the first degree in that he does not do the deed himself or through an innocent agent but in some way participates in the commission of the felony by aiding, commanding, counseling or encouraging the actual perpetrator. R. Perkins, Criminal Law 658–659 (2d ed. 1969); Clark & Marshall, A Treatise on the Law of Crimes § 8.02 (7th ed. 1967). Unless he contributed actual aid it is necessary that his approval should be manifested by some word or act in such a way that it operated on the mind of the perpetrator. Even the secret acquiescence or approval of the bystander is not sufficient to taint him with the guilt of the crime. 'Counsel, command or encouragement

may be in the form of words or gestures. Such a purpose "may be manifested by acts, words, signs, motions, or any conduct which unmistakably evinces a design to encourage, incite, or approve of the crime." Promises or threats are very effective for this purpose, but much less will meet the legal requirement, as where a bystander merely emboldened the perpetrator to kill the deceased.... One may also encourage a crime by merely standing by for the purpose of giving aid to the perpetrator if necessary, provided the latter is aware of this purpose. Guilt or innocence of the abettor ... is not determined by the quantum of his advice or encouragement. If it is rendered to induce another to commit the crime and actually has this effect, no more is required.' Perkins at 659. *'To be guilty as a principal in the second degree, a criminal intent is necessary.'* Clark & Marshall § 8.02. *'Aid or encouragement to another who is actually perpetrating a felony will not make the aider or encourager guilty of the crime if it is rendered without mens rea. It is without mens rea if the giver does not know or have reason to know of the criminal intention of the other....* In general it is the abettor's state of mind rather than the state of mind of the perpetrator which determines the abettor's guilt or innocence.... "[I]ntention" includes not only the purpose in mind but also such results as are known to be substantially certain to follow.' Perkins at 662–663."

*Pope*, 284 Md. at 331–32, 396 A.2d at 1067–68 (emphasis added) (footnote omitted). Viewing the evidence in light of these criteria, we held that it was not legally sufficient to prove that Pope was a principal in the second degree of child abuse. She neither actually aided the mother in the acts of abuse nor did she counsel, command or encourage her. "The evidence certainly showed that Pope 'witnessed a terrible event' and that she 'stood by' while the mother killed the child. But the culpability for her conduct during the abuse of the child must be determined strictly within

the law or else the basic tenets of our system of justice are prostituted." *Id.* at 333, 396 A.2d at 1068.

In *Watson v. State,* 208 Md. 210, 117 A.2d 549 (1955), Watson was convicted of the murder of a newborn infant. Watson claimed that Polly Conway, a witness to the murder, was an accomplice and that he could not be convicted based upon her uncorroborated testimony. Thus, we had to determine whether Conway was an accomplice, that is, one who knowingly, voluntarily, and with common interest with the principal offender, participates in the commission of a crime either as a principal or as an accessory before the fact. There was no evidence that Conway knew that the appellant intended to kill the child whom he drowned in a tub, until he got the tub of water and placed the child in it. There was no evidence that she aided or abetted the crime or encouraged it. She was merely a neighbor who had come to assist a woman who was giving birth to a child without the aid of a physician. She admitted that she made no objection when the appellant placed the baby in the tub of water and that she did not notify the police. The Court noted, however, that the fact that a person witnesses a crime and makes no objection to its commission and does not notify the police does not make that person an accomplice: "To be an accomplice a person must participate in the commission of a crime knowingly, voluntarily, and with common criminal intent with the principal offender, or must in some way advocate or encourage the commission of the crime." *Id.* at 219, 117 A.2d at 553.[2]

The State argues that we held to the contrary in *Sheppard v. State,* 312 Md. 118, 538 A.2d 773 (1988). In that

---

2. *See also Seward v. State,* 208 Md. 341, 118 A.2d 505 (1955) (malicious destruction of property); *Anello v. State,* 201 Md. 164, 93 A.2d 71 (1952) (unlawfully carrying away an automobile out of the custody and use of the owner). These cases hold that where a specific intent is a necessary element of a misdemeanor, any party who aids the actual perpetrator in the commission of the offense may only be convicted if that person entertained the requisite intent or knew that the party actually performing the criminal act entertained the necessary intent.

case, the evidence showed that Sheppard participated in an armed robbery with three other men. Sheppard was apprehended while fleeing the scene. Subsequent to Sheppard's apprehension, one of the other robbers fired gun shots at the police officers chasing them. On the basis of those shootings, Sheppard was convicted of assaults with intent to murder, crimes requiring a specific intent to kill. There was no evidence, however, that Sheppard personally harbored the intent to kill. We affirmed his conviction, holding that "when two or more persons participate in a criminal offense, each is responsible for the commission of the offense and for any other criminal acts done in furtherance of the commission of the offense or the escape therefrom." *Id.* at 121–22, 538 A.2d at 774.

Contrary to the State's contention, Sheppard's responsibility for the assaults with intent to murder was not dependent upon proof that he aided and abetted the commission of those offenses; rather, his complicity rested on the fact that he aided and abetted the armed robbery. Because the assaults were determined by the jury to have been in furtherance of the commission of the armed robbery and the escape therefrom, Sheppard was properly convicted of those aggravated assaults notwithstanding the absence of any evidence that he intended to kill the police officers. *See Campbell v. State*, 293 Md. 438, 451–52, 444 A.2d 1034, 1042 (1982) (where during course of armed robbery a fleeing co-felon was killed by either a police officer or a victim, the killing of the co-felon was committed to thwart the felony rather than to further it, and under Maryland's felony-murder doctrine, the surviving felon was not guilty of murder); W. Clark & W. Marshall, *Law of Crimes* § 9.07, at 580 (7th ed. 1967) (when the target offense, for which the conspirators pooled their talents, is actually committed, liability for future acts done in furtherance of the conspiracy attaches to a conspirator from membership and not necessarily because of any physical postaffiliation actions on his part); R. Perkins & R. Boyce, *Criminal Law*, ch. 6 § 5(F), at 708 (3d ed. 1982) ("If the purpose of the

conspiracy is to commit a dangerous felony each member runs the risk of having the venture end in homicide, even if he has forbidden the others to make use of deadly force. Hence each is guilty of murder if one of them commits homicide in the perpetration or attempted perpetration of an agreed-upon robbery or burglary." (footnotes omitted)).

■ In the instant case there is no suggestion that the victim was shot by Raines in furtherance of the commission of a criminal offense which Raines and Bentley had undertaken, and the principle we applied in *Sheppard* is inapposite. Nor is there any evidence from which it could be inferred that Bentley knew or believed that Raines intended to kill, or that he himself acted with such intent. We agree with the Court of Special Appeals that the evidence was insufficient to convict Bentley of murder in the first degree. The intermediate appellate court concluded that the evidence against Bentley supported a conviction of murder in the second degree, apparently on the basis that Bentley's actions coupled with his prior knowledge demonstrated the malevolent state of mind often characterized as "depraved heart." Bentley did not challenge that determination by filing a cross-petition for certiorari. Accordingly, we shall affirm the judgment of the Court of Special Appeals with respect to Bentley.

JUDGMENTS OF THE COURT OF SPECIAL APPEALS AFFIRMED IN PART AND REVERSED IN PART; CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO AFFIRM THE JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY WITH RESPECT TO RESPONDENT RAINES AND TO VACATE THE JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY WITH RESPECT TO RESPONDENT BENTLEY, DIRECTING THAT A VERDICT OF GUILTY OF SECOND DEGREE MURDER BE ENTERED AGAINST HIM AND THAT HE BE SENTENCED ACCORDINGLY. COSTS IN THE COURT OF SPECIAL APPEALS AND IN THIS COURT TO BE PAID ½ BY BALTIMORE COUNTY AND ½ BY RESPONDENT RAINES.