754 A.2d 1064

**Roosevelt Ptrdyon SYDNOR**

v.

**STATE of Maryland.**

**No. 1217, Sept. Term, 1999.**

Court of Special Appeals of Maryland.

June 30, 2000.

174

George E. Burns, Jr., Asst. Public Defender (Stephen E. Harris, Public Defender, on the brief), Baltimore, for appellant.

Devy Patterson Russell, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., and Patricia Jessamy, State's Atty. for Baltimore City, on the brief), Baltimore, for appellee.

Submitted before WENNER, DAVIS and PAUL E. ALPERT (retired, specially assigned), JJ.

DAVIS, Judge.

A jury sitting in the Circuit Court for Baltimore City convicted appellant Roosevelt Ptrdyon Sydnor of voluntary manslaughter and unlawful use of a handgun during a crime of violence.[1] The court subsequently sentenced him to concurrent sentences of ten years for manslaughter and twelve years for use of a handgun, the first five years to be served without the possibility of parole. Appellant asks a single question on appeal:

Did the trial court err in its self-defense jury instruction? Upon a review of the relevant law and facts, we shall affirm the court's judgments.

## FACTUAL BACKGROUND

At approximately 8:40 p.m. on December 9, 1998, appellant shot and killed Anthony Jackson, the victim, in the 800 block of Chester Street in Baltimore City. Appellant admitted to shooting the victim but claimed he acted in self-defense. Among others, two residents of the block in which the victim was killed testified for the State.

Yvette Kiah testified that, just before the shooting, she looked out of her window, in the 800 block of Chester Street, and saw three men across the street struggling for a gun. She heard one of the men say, "Oh, you have a gun, M–F. Well, if you have a gun you better use it. . . ." She backed away from the window and heard the sound of running feet. She then heard five or six gunshots. When she looked out of the window again, she saw a man running, followed by several people running behind him.

---

1. The jury acquitted appellant of first degree murder, second degree murder, and wearing, carrying, or transporting a handgun.

Yavonda Jones testified that, at approximately 8:40 p.m. on December 9, 1998, she exited her home in the 800 block of Chester Street and walked to the corner store. As she did so, she saw appellant sitting on the steps of a row house. She then saw the victim approach appellant and pull a gun from his pocket. Appellant and the victim struggled for control of the gun. After appellant and two other men were successful in obtaining the gun from the victim, the victim started to run away. When the victim was between fifteen and twenty feet away from appellant, appellant shot him in the back and then ran.

Police officers, who were nearby when the shooting occurred, chased appellant several blocks. Eventually the police apprehended appellant, who was holding a .22 caliber gun. Appellant told the police, "I shot the mother fucker because he was beating me with a gun and robbed me for $30 so I took the gun from him and shot him."

After appellant was arrested, he was taken to a police station for questioning. While at the station, appellant gave a taped statement to the police in which he explained the events preceding the shooting. In the statement, appellant said:

Well, it all started when ... I was sitting on the steps, you know, drinking with some of my friends. And all of the [sic] sudden this guy just walked up ... to me and asked me did I have any weed? So I stated no, I do not smoke.... All of the [sic] sudden he starts to say[ ] something about my jewelry on my neck and pulled his gun out and told me to give it up, you know. Next thing you know, this guy was talking about how he [sic] going to do this to me and all of that.... [T]hen he came across the head, in the back of the head, with the gun.... He got [sic] $30 from me[.] ... He was about to take my chain [and he] still kept talking about how he [sic] going to kill me and all of that, right. So, as soon as I saw ... he had the gun pointed a different way, I just ... grabbed the gun.... That's when I asked this other guy, Eric, ... to help so he helped me. So we got to the point where we got to tussling so hard on the front steps that we tussled all the way to the,

you know, to the street.... Then he hit me in my eye, both eyes.... I twisted the gun out of his hand.... After that I panicked I just shot at him, as soon as I got the gun from him. You know, I didn't know whether or not he had ... another gun on him or not.... Like I said I looked at it like this, it would be my life or his life. He said he was going to kill me. I was sitting there minding my business.

Appellant told the officers that, after he shot the victim, he panicked and ran.

The victim died of four gunshot wounds to his body. One shot entered the front of his thigh, one shot entered the back side of his forearm, and two shots entered his back. One of the shots to his back showed stippling, which, according to the medical examiner, results when a gun is fired at close range. The police recovered thirty dollars from the victim's body.

## LEGAL ANALYSIS

### STANDARD OF REVIEW

Judge Thieme, writing for the Court in *Redcross v. State*, 121 Md.App. 320, 326, 708 A.2d 1154 (1998), succinctly reiterated our task when a party assails the trial court's charge to the jury:

Maryland Rule 4–325(c) provides that a trial court "may, and at the request of any party shall, instruct the jury as to the applicable law and the extent to which the instructions are binding." When the trial court does so instruct the jury, it has a duty "to provide an accurate and complete statement of the law." We, as a reviewing court, must determine whether "the requested instruction was a correct statement of the law; whether it was applicable under the facts of the case; and whether it was fairly covered in the instructions actually given." In making that determination, we view the instructions as a whole and not in isolation or out of context.

(Citations and emphasis omitted.)

### I

Appellant's singular claim of error is that

[t]he trial judge departed from the pattern jury instruction because he thought it would be "confusing" for the jury to view the incident as one event (robbery) when it might be two events (robbery and a separate shooting). Under the facts of this case the judge was wrong as a matter of law.

Citing *State v. Raines,* 326 Md. 582, 606 A.2d 265 (1992), he contends that the Court of Appeals, in deciding what constitutes complicity for the purpose of determining accomplice liability, declared that an escape was considered part of the robbery "[b]ecause the assaults were determined by the jury to have been in furtherance of the commission of the armed robbery and the escape therefrom...." *Id.* at 598, 606 A.2d 265. He further constructs his hypothesis by citing *Mangerich v. State,* 93 Nev. 683, 572 P.2d 542, 543 (1977), for the proposition that "force used to prevent the immediate retaking of property constitutes robbery" and that "[w]hether the purpose of the force was to facilitate the escape or to prevent the victim from retaking the property is irrelevant because the purpose of not having the money retaken is served."

Appellant claims that the State's theory of the case was summarized in its opening statement when the prosecutor said: "The State does not dispute in anyway [sic] that Anthony Jackson robbed or tried to rob the [appellant] and we don't dispute that the [appellant] got the gun away from Anthony Jackson and used that gun to shoot him." Characterizing the dispute between the defense and the State as "a narrow one," appellant posits that Jackson robbed appellant, who successfully disarmed Jackson, subsequently chasing him down the street one hundred feet or more, and then shot him several times, according to the State's theory of the case. Appellant contrasts his theory as a shooting which took place in the course of a struggle between appellant and the robber. Appellant summarily postulates his claim of error:

Thus, even if the scenario urged by the State were accepted, the shooting was part of the robbery and not a separate event. It follows that the State was entitled to have the jury to decide [sic] *if the State disproved self-defense by establishing that excessive force had been used;* the State

was *not entitled to have the jury reject the defense because Appellant had a duty to retreat.* Indeed, if Appellant had a duty to retreat no robbery victim would be entitled to attempt to retake his property or apprehend the robber. There is no legal support for such a counterintuitive notion.

It is impossible to know on what theory the jury relied in reaching its verdict. Under well established legal principles, this ambiguity must be resolved in favor of Appellant. (Citing *Nightingale v. State,* 312 Md. 699, 542 A.2d 373 (1988)) (emphasis added).

■ The State initially replies that appellant has failed to preserve this argument for our review. After the parties had rested, the court instructed the jury on the duty to retreat when interposing the defense of self-defense:

And further with respect to the defense of self-defense: Deadly force is the amount of force reasonably calculated to cause death or serious bodily harm. If you find the [appellant] used deadly force, you must decide whether the use of deadly force was reasonable. Deadly force is reasonable if the [appellant] actually had a reasonable belief that the aggressor's force was or would be deadly and the [appellant] needed a deadly force response. In addition, before using deadly force, the [appellant] is required to make all reasonable efforts to retreat. [The appellant] does not have to retreat if the [appellant] was in his home or retreat was unsafe or the avenue of retreat was unknown to the [appellant] or the [appellant] was being robbed *at the moment that the force was used* or the [appellant] was lawfully arresting the victim. If you find the [appellant] did not use deadly force, then the [appellant] had no duty to retreat.

Appellant took no exception to the court's instruction.[2] After the jury retired to deliberate, the jury sent a note to the

---

2. Maryland Pattern Jury Instruction 5:07 on self-defense provides:
[In addition, before using deadly-force, the defendant is required to make all reasonable effort to retreat. The defendant does not have to retreat if [the defendant was in [his][her] home], [retreat was unsafe], [the avenue of retreat was unknown to the defendant], [the defendant

trial court asking for re-instruction on, among other things, self-defense. Thereafter, the court re-instructed the jury on the duty to retreat as follows:

> In addition, before using deadly force, the [appellant] is required to make all reasonable effort to retreat. The [appellant] does not have to retreat if the [appellant] was in his home or retreat was unsafe or if the avenue of retreat was unknown to the [appellant] or *if at the moment that the shots were fired* the [appellant] was being robbed, or the defendant was lawfully arresting the victim. If you find the [appellant] did not use deadly force, then the [appellant] had no duty to retreat.

After the re-instruction, the defense took exception to the language, "if at the moment that the shots were fired." The court responded that it instructed the jury as it did because

> it could be confusing for the jury to view the robbery and the shooting as one incident when, in fact, it was also possible for them to view it as separate incidents, and so in order for the law to adequately be explained so that the State could differentiate between the moment of the robbery, as in fact they did, and for you to try to tie the two into one event, I thought that it was necessary in this particular case, and it was also not prejudicial in this particular case, to give the jury the most accurate recitation of the law.

> The reason that you don't have a more accurate re[-]instruction in *Willey* [*v. State*, 328 Md. 126, 613 A.2d 956 (1992) ] is because *Willey* is not an incomplete self-defense during a robbery situation and so therefore I had to make that modification in order to give the jury the most accurate definition of the law. I think to literally quote *Willey dicta* on that issue without the recalibration, would have been more misleading to the jury, although to your advantage,

---

was being robbed], [the defendant was lawfully arresting the victim]. If you find that the defendant did not use deadly-force, then the defendant had no duty to retreat.]

than I'm permitted to do in order to accurate[ly] advise the jury as to the law.

The court declined to re-instruct the jury.

Maryland Rule 4–325(e) (2000) provides:

No party may assign as error the giving or the failure to give an instruction unless the party objects on the record promptly after the court instructs the jury, stating distinctly the matter to which the party objects and the grounds of the objection.

Thus, the Rule requires that the offended party object to the given instruction before the jury retires to deliberate. *State v. Hutchinson,* 287 Md. 198, 202, 411 A.2d 1035 (1980). Here, appellant did not object to the original jury instruction. Only after the jury retired to deliberate and sent a note to the court asking for re-instruction, which the court gave, did appellant object.

In addressing the preservation issue, appellant argues that the original and supplemental jury instructions on the duty to retreat were different. In the original instruction, the court stated that a defendant does not have a duty to retreat if *"the defendant was being robbed at the moment that the force was used."* In the supplemental instruction, the court stated that a defendant does not have a duty to retreat *"if at the moment that the shots were fired the defendant was being robbed."* Under both instructions, the jury was instructed that the accused does not have to retreat if he was being robbed at the time he was acting in self-defense.

In our view, however, given the testimony of Yavonda Jones that, at least one of the four shots was fired into the victim's back at a distance of fifteen to twenty feet from appellant, the re-instruction had the effect of placing greater emphasis on the severability of appellant's employment of force. The reference, in the original instruction, to "the force [which] was used" tended to depict the four shots fired collectively as a single act that the jury had to determine either occurred during the robbery or after the robbery was thwarted and the victim was in the process of fleeing the scene. As we see it,

the re-instruction to which appellant excepted was different—at least in its emphasis—and thus, appellant did not waive his objection thereto by failing to object to the original jury instruction.

Even if we were to conclude that appellant failed to preserve the issue of the propriety, *vel non*, of the court's instructions in a technical sense, appellant's counsel interposed his exception in response to the jury's request for re-instructions. Significantly, the exception was lodged at a point in time when the trial judge was afforded an opportunity to correct any instruction that constituted an erroneous statement of the law or otherwise misled the jury in its advisement regarding applying the law to the facts. The purpose of Maryland Rule 8–131 is to allow the court to correct trial errors, obviating the necessity to retry cases had a potential error been brought to the attention of the trial judge. The Rule is also designed to prevent lawyers from "sandbagging" the judge and, in essence, obtaining a second "bite of the apple" after appellate review.

Although we retain plenary authority to take cognizance of plain error prejudicial to the rights of the accused and we have complete discretion in deciding to review the alleged error, *Austin v. State,* 90 Md.App. 254, 257–58, 600 A.2d 1142 (1992), counsel obviously believed challenging a jury instruction that parroted the applicable pattern jury instruction would have been to no avail. Appellant held a much different view of the merits of challenging the departure from the pattern jury instructions and we cannot say, on the record before us that at least the interposition of the exception was clearly without substantial justification. In other words, the issue is sufficiently viable to warrant our review.

## II

It is generally well recognized that a defendant is entitled to instructions on the law when generated by the evidence and not covered by instructions actually given. *Patterson v. State,* 356 Md. 677, 683, 741 A.2d 1119 (1999); *Ware v. State,* 348

Md. 19, 58, 702 A.2d 699 (1997); *see also* Md. Rule 4-325(c) (2000). Appellant asserts that the trial judges's departure from the recommended language in the pattern jury instructions resulted in the possibility that the jury rejected his claim of self-defense because it erroneously believed he had a duty to retreat. In general, we have favored implementation of the Maryland Pattern Jury Instructions:

> Nevertheless, we say for the benefit of trial judges generally that the wise course of action is to give instructions in the form, where applicable, of our Maryland Pattern Jury Instructions. Those instructions have been put together by a group of distinguished judges and lawyers who almost amount to a "Who's Who" of the Maryland Bench and Bar. Many of these instructions have been passed upon by our appellate courts.

*Green v. State,* 127 Md.App. 758, 771, 736 A.2d 450 (1999).

 As the State points out, however, deviation from the recommended language in the pattern jury instructions does not *per se* constitute error. We explained in *Green v. State,* 119 Md.App. 547, 562, 705 A.2d 133 (1998), that, "When the evidence generates an issue that is not covered by a pattern instruction, we must count on the court to incorporate relevant and valid legal principles gleaned from the case law." The court sought "to give the jury the most accurate recitation of the law" in its modification of the pattern instruction from "at the moment that the force was used" to "at the moment the shots were fired." The change more precisely explicates the law of self-defense when considered in the context of the trial judge's express advisement to the jury, in essence, that appellant was no longer entitled to use deadly force once there no longer was the exigency presented by the need to repel the robber.

It was then the responsibility of the jury, as fact finder, to determine from the evidence whether the force employed by appellant was for the purpose of repelling the robbery or whether the force constituted an act, separate and independent from the robbery. *Hall v. State,* 119 Md.App. 377, 393,

705 A.2d 50 (1998). In the case *sub judice,* appellant's duty to retreat apparently evolved as a primary issue when, as appellant posits, the ultimate determination in this case must be whether "the State disproved self defense by establishing that excessive force had been used."

 When a defendant seeks to escape criminal responsibility by claiming deadly force was employed to repel force, threat of force or intimidation employed by a robber, however, proof that the force exerted by the accused was employed at a time other than when he was being robbed is the *sine qua non* of proof of excessive force. To be sure, excessive force may be proven by a myriad of other circumstances, i.e., multiple stab wounds or shots under circumstances which indicate an assailant could have been neutralized with far less force, but, in the instant case, proof that, at the moment appellant fired the fatal shots, he was not being robbed is tantamount to proof of excessive force, absent any threat of death or serious bodily harm posed by the robber independent of that used to accomplish the forcible "taking."

 The Court had instructed the jury that, "If you find the [appellant] used deadly force, you must decide whether the use of deadly force was reasonable. Deadly force is reasonable if the [appellant] actually had a reasonable belief that the aggressor's force was or would be deadly and the [appellant] needed a deadly response." Thus, in conjunction with the advisement that there was no duty to retreat if at the time the shots were fired the defendant was being robbed, the jury was told that any response to force or threat of force by the robber must be directly proportional. The net result is that the jury was properly informed that it must decide whether the deadly force employed by appellant was needed to repel what appellant perceived to be a deadly assault. Appellant argues that the court's instructions resulted in the jury rejecting his defense because substituting "shots" for "force" connotes a robbery followed by a shooting and, hence, two separate events. The right to employ force to defend oneself is rooted in necessity and the law sanctions the use of such force only to

the extent it is required to neutralize an imminent and immediate threat. *State v. Martin*, 329 Md. 351, 357, 619 A.2d 992 (1993).

The rationale for carving out an exception for the duty to retreat at the moment one is being robbed is because force or threat of force accompanies the act of "taking." No such exception for the use of deadly force is recognized for larceny, i.e., during the theft of one's appliance or vehicle for the very reason that theft does not involve the threat of death or serious bodily injury. Consequently, whether the jury considered the confrontation as a single event or a robbery and a shooting is immaterial since its charge was to determine to what force the shooting was a response and was it a proportional and reasonable exercise of deadly force. Stated otherwise, applying the standard of necessity, were the four shots fired necessary to neutralize the perceived danger? Because the instructions, as a whole, required the jury to decide the narrow issue of the reasonableness of appellant's deadly response, it in no way relieved the jury of its responsibility to decide from the credible evidence whether the shots were fired after the victim was disarmed or during a struggle for the gun.

The evidence is uncontradicted that appellant, with the aid of his friend, Eric, disarmed the victim who had robbed him, then shot the victim four times. The jury returned a verdict of guilty to the lesser offense of manslaughter, from which we can conclude that circumstances of mitigation were factored into the verdict. We can only surmise from the manslaughter verdict that the jury believed that appellant was entitled to the defense of imperfect self-defense. *State v. Faulkner*, 301 Md. 482, 500, 483 A.2d 759 (1984). The only other possibility not generated by the evidence in this case would be an intentional homicide committed during a time when appellant's mental faculties and reasoning were impaired, i.e., the heat of passion. *See generally McKay v. State*, 90 Md.App. 204, 600 A.2d 904 (1992). Had mitigating circumstances not been factored into the verdict, appellant would have been convicted of first or second degree murder.

From the above, we hold that the lower court was not wrong as a matter of law by reason of its departure from the pattern jury instructions. The short answer to appellant's assertion that the jury may have rejected his defense because of his duty to retreat is that the original instruction and the re-instruction required as a temporal pre-condition to the use of deadly force that "the force" or "the shots" be employed at a point in time when appellant was being robbed. Such a requirement is merely a reassertion of the cardinal principle undergirding self-defense, namely, that deadly force may only be resorted to when the accused has reasonable grounds (Perfect Self–Defense) or subjective belief (Imperfect Self–Defense) to believe himself or herself in apparent *imminent* or *immediate* danger of death or serious bodily harm from his or her assailant or potential assailant.

The duty to retreat is but a corollary to the exigency requirement before one is deemed justified in taking the life of another. In other words, all reasonable alternatives must be explored, under the circumstances, before resort to deadly force. In hypothesizing that no robbery victim would ever be able to retake his property or apprehend the robber if there were a duty to retreat, appellant disregards the fact that no duty to retreat attaches where the force to be employed is not lethal. Stated otherwise, a robbery victim is free to use non-lethal force to accomplish the recovery of his property or apprehend the robber.

It is only when deadly force is contemplated that its use must be confined to repulsion of the robber at the moment that the robber exerts force or exhibits a threat of force; such circumstances present the same exigency as that which arises when one is in imminent and immediate danger of death or serious bodily harm when robbery is not the motive. Once the imminent threat of death or serious bodily harm dissipates, a lethal response is no longer warranted. Thus, appellant was entitled to use deadly force at the moment he was being robbed and, it appears, the jury so found; otherwise, the verdict would have been first or second degree murder. The

jury apparently concluded that the force employed was excessive.

Although the concept of excessive force was explained separately—as it should have been—in charging the jury, the two concepts were interrelated under the facts of this case. Ergo, pursuant to the instructions actually given by the trial judge, any employment of deadly force at a time when, from the evidence, the jury found appellant was not being robbed, such employment of deadly force constitutes, *a fortiori*, excessive force in the absence of independent grounds to believe death or serious bodily injury is imminent. The logical extension of appellant's argument is that the court's instruction should not have imposed upon him a duty to retreat *or resort to non-lethal force* notwithstanding that the pattern jury instruction and the instructions given by the trial judge treat deadly force as a creature of necessity and limit its use to those occasions when one is being robbed or only deadly force will neutralize the attack of an assailant. Ultimately, it was the jury's prerogative to determine whether the force used by appellant coincided with "the moment" appellant was being robbed and whether, as appellant claimed in his statement, he believed the victim may have had another gun or continued to pose a threat. Even if the jury felt appellant subjectively believed he continued to be in danger after wresting the gun from the victim, if the jury further concluded appellant's subjective belief was unreasonable, the manslaughter verdict the jury returned was appropriate.

### III

As noted, *supra*, faced with the explicit language of the pattern jury instructions and the lower court's instructions restricting the legally permissible use of deadly force to the time that the robbery is being committed, appellant seeks to extend the occurrence of the robbery to include the escape of the victim. He cites, in support of this concept, three decisions which are inapposite to the case at bar. In *State v. Raines, supra,* the Court of Appeals considered whether the

first degree murder conviction of the accomplice, Bentley, who had been convicted as a principal in the second degree, could be sustained in the absence of evidence that the second degree principal "entertained [the necessary specific intent] or knew that the principal in the first degree entertained such intent." *Raines*, 326 Md. at 594, 606 A.2d 265.

Raines, who was convicted as the principal in the first degree, had been the passenger in a pick-up truck driven by Bentley and had fired a fatal shot at a tractor-trailer operator, Cynthia Southern, on the Baltimore Beltway after a random shooting spree in which Raines had fired a shot at a passing automobile, a second shot through the window of the bar where they had been drinking and a third shot through the window of an acquaintance, Hymie Kelley.

In rejecting the State's reliance on the decision in *Sheppard v. State*, 312 Md. 118, 538 A.2d 773 (1988), wherein the Court upheld the conviction of the appellant in that case for assault with intent to murder based on shots fired at police officers chasing his three accomplices *after* Sheppard was already in custody, the *Raines* Court said:

> Contrary to the State's contention, Sheppard's responsibility for the assaults with intent to murder was not dependent upon proof that he aided and abetted the commission of those offenses; rather, his complicity rested on the fact that he aided and abetted the armed robbery. Because the assaults were determined by the jury to have been in furtherance of the commission of the armed robbery and the escape therefrom, Sheppard was properly convicted of those aggravated assaults notwithstanding the absence of any evidence that he intended to kill the police officers.

*Raines*, 326 Md. at 598, 606 A.2d 265 (citations omitted).

The principle upon which the Court of Appeals relied in *Sheppard*, as discussed in *Raines*, bears no relation and is totally inapplicable to the legal requirement that deadly force, to be legally justified, must be employed at the "moment the force was used/shots were fired." Assignment of criminal responsibility upon individual actors who participate in a com-

mon criminal episode was the issue in *Sheppard* and *Raines;* the Court determined the relationship between the degree of participation and the consequences the law imposes according to the actor's culpability. It held that Sheppard could be held to account for criminal acts occurring during the escape of his co-felons because what occurred during the flight of his accomplices was in furtherance of a criminal event in which all four armed robbers participated and for which they all bore responsibility for the event as well as the aftermath.

Appellant's attempt to draw an analogy between the facts in *Raines* and *Sheppard* and the victim's attempt to escape is patently flawed. Initially, the purpose of viewing the escape of the co-felon as part of the robbery in legal contemplation is to assign criminal responsibility, rather than to relieve the party seeking to treat the robbery and escape as one transaction from criminal responsibility. More important, the rationale undergirding the requirement that one retreat before employing deadly force is that employment of such force is an act which is responsive to a threat of death or serious bodily harm and the time for resort to such force does not extend to the time a fleeing assailant attempts to escape, unless there is evidence that he continues to pose a deadly threat as he flees.

In *Mangerich v. State, supra,* also relied upon by appellant, the Supreme Court of Nevada considered appellant's assertion that "force or fear was used to perfect his escape rather than to retain possession of the stolen property." Sydnor seizes upon the Court's language in discussing the use of force: "Where one 'uses force or intimidation to prevent an immediate retaking ... *this is all one transaction and constitutes robbery.* ... [I]t is irrelevant whether [Mangerich] intended the [threat] *to effectuate his escape* or to prevent the [money] from being retaken, since the latter purpose was in fact served.'" *Mangerich,* 572 P.2d at 543 (citations omitted) (emphasis added).

The *Mangerich* Court was essentially required to determine the contemporaneity of the force employed in relation to the "taking" and concluded that force employed to effectuate the

robber's escape or prevent a retaking of the stolen property constituted part of a single transaction. A determination of whether the evidence of a "taking" occurs at a point in time in relation to the force used to constitute robbery is likewise not analogous to the case at hand. The force, in *Mangerich*, was employed to *effectuate* the escape rather than *prevent* the escape as is the case here. Moreover, *Mangerich* is distinguishable for the same reasons as *Raines* and *Sheppard*, i.e., that the circumstances under which one may use deadly force reference a specific exigency requiring extraordinary action; preventing an assailant from fleeing or preventing one from retaking stolen property are not viewed as exigencies warranting the use of deadly force.

Finally, appellant relies on *Cantrell v. State*, 184 Ga.App. 384, 361 S.E.2d 689, 690 (1987), wherein the Georgia Court of Appeals considered Cantrell's contention that "the force employed was not contemporaneous with the taking, rendering proof of robbery by force impossible." (Citation omitted.) According to Buffington, the victim, he met Cantrell, whom he knew from high school, on the street and allowed Cantrell to see a gold necklace that he had been wearing. Cantrell put the necklace in his pocket and turned to walk away, whereupon Buffington demanded its return and was struck in the face by Cantrell and another man. The court summarily dismissed appellant's contention, stating: "Although appellant had custody of the necklace pursuant to Buffington's consent, possession of the necklace did not change to appellant until Buffington, by means of violence, had been dissuaded from seeking its return. That being so, *it was the force which effected the taking*." *Id.* at 690 (emphasis added). The consideration of the temporal relationship between the "taking" and the force employed in the robbery prosecution, in *Cantrell*, is inapplicable to the instant case for the same reasons *Mangerich* is inapplicable.

In sum, the law reserves the justifiable taking of the life of another for extraordinary, carefully prescribed circumstances grounded on necessity. When those circum-

stances, i.e., being subjected to a robbery or where one believes he or she is in danger of imminent death or serious bodily harm, are no longer extant, the basis for lethal force dissipates and one's response must be measured and directly proportional to any perceived threat that does not rise to the level of being life threatening. The law is well settled that the duty to retreat does not attach when one uses non-lethal force to repel an assailant; however, it was for the jury, in the case at hand, to determine whether discharging four shots—two of which entered the victim's back—after subduing the robber was a necessary employment of force occurring during a struggle with the robber or an event independent of—and subsequent to—the robbery. Patently, the jury instructions properly permitted a finding that one or more shots were not fired to repel the victim, but rather were the employment of force at a point in time after appellant was no longer in harm's way.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED.**

**COSTS TO BE PAID BY APPELLANT.**