REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 747

September Term, 2015

_____

PAUL EARNEST HOWARD, JR.

v.

STATE OF MARYLAND

_____

Eyler, Deborah S.,
Wright,
Alpert, Paul E.
     (Senior Judge, Specially Assigned),

JJ.
_____

Opinion by Eyler, Deborah S., J.
_____

Filed:  January 31, 2017

.

A jury in the Circuit Court for Baltimore County convicted Paul Howard, Jr., of first-degree assault, first-degree burglary, theft under $1,000, and false imprisonment. The court sentenced him to a total of 81½ years of executed prison time.[1]

On appeal, Howard presents seven issues for review, which we have rephrased:

I.      Did the trial court err by denying his motion to inspect the interior of the house where the crimes were committed, which was solely under the control of the victim and her son?

II.     Did the trial court abuse its discretion by denying his motion for mistrial and to strike the testimony of the State's latent fingerprint expert?

III.    Did the trial court abuse its discretion by giving a modified jury instruction on first-degree burglary?

IV.     Did the trial court abuse its discretion by admitting the State's DNA evidence without conducting a *Frye-Reed* hearing?

V.      Was the evidence legally sufficient to sustain his conviction for false imprisonment?

VI.     Did the sentencing court err by not merging his sentences for false imprisonment and first-degree assault?

VII.    Did the sentence for false imprisonment violate his constitutional right to be free from cruel and unusual punishment?

We shall affirm the judgments of the circuit court.

---

[1] Specifically, Howard was sentenced to 25 years' imprisonment for first-degree assault, 20 years' imprisonment for first-degree burglary, 18 months' imprisonment for theft under $1,000, and 35 years' imprisonment for false imprisonment, all to be served consecutively.

**FACTS AND PROCEEDINGS**

Howard's trial commenced on April 15, 2015, and concluded on April 20, 2015. The State's witnesses included Edna Lobell, the victim, who was 98 years old at the time of the crimes. The following evidence was adduced.

Ms. Lobell moved into her row house in Rogers Forge in 1963. She still lives there. On April 26, 2014, she was at home when, in the early afternoon, Howard knocked on her back door. Ms. Lobell did not know Howard and had never met him.

Ms. Lobell answered the door, and Howard told her that her next-door neighbor, Linda Lang, had hired him to make some repairs to her roof. He offered to make repairs to her roof as well. In fact, Ms. Lang had not hired Howard to fix her roof or to do anything and had never met him. Ms. Lobell allowed Howard to come in and eventually agreed for him to prepare an estimate for the repair work. Howard insisted on being paid in advance for the estimate and for some materials. Ms. Lobell said she only had $30 in cash. He told her that was not enough. She gave him the $30 and wrote him a check for $40 on her State Employees Credit Union ("SECU") checking account. He gave her his name to use to make the check out to him. He then left, saying he was going to get some materials.

At around 6:00 p.m. the same day, Howard again knocked on Ms. Lobell's back door. She answered, and he said something to the effect of "Remember me? . . . Didn't expect me to come back so soon, did you?" Ms. Lobell let him in, and he proceeded to sit in a chair in her dining room. He had no materials with him that she could see. He remained in her house for at least an hour and a half. He asked her for more money. She

said she didn't have any. At some point, he went upstairs to her bedroom. She kept some money hidden in envelopes behind pictures hanging on her bedroom walls. He found one such envelope, took the money from it, and left the envelope on the dresser.

When Howard returned to the dining room, Ms. Lobell asked him to leave because it was time for her to eat dinner. He became upset and violent, grabbing her by the arms, "propel[ing]" her from the dining room into the living room, throwing her to the floor, and choking her. Having previously broken her right hip, Ms. Lobell knew when she hit the floor that her left hip had broken. Howard announced that he was going to return the next day and take her to the bank to withdraw $20,000 for him. He pushed his finger down her throat, cutting her lip and causing her dentures to come out. He got on top of her and attempted to have sex with her, but his penis was "limp." Ms. Lobell bit him hard on the finger, drawing blood. He got up, turned up the volume on the television, and went into the kitchen, where he pulled the telephone base out of the wall and threw a white box that was the electronic connecting device for a medical alert system down the stairs into the basement.

As she lay on the living room floor, Ms. Lobell managed to press her medical alert button, which she wore on a device that looked like an ordinary watch. Howard returned to the living room with a bottle of liquor. As he was starting to get on top of Ms. Lobell again, Lieutenant Byron Welker, accompanied by other members of the Baltimore County Fire Department ("BCFD"), arrived at the front door and knocked. Howard jumped up and ran out the back door. When there was no response to the knock, Lieutenant Welker gained entry and found Ms. Lobell on the living room floor with her

-3-

pants pulled down around her ankles. She told him a man had tried to rape her and that he had run out the back door. Lieutenant Welker saw a liquor bottle on the floor near Ms. Lobell. The base of a phone, which appeared to have been pulled from the wall, was on the floor. The back door to the house was ajar. Lieutenant Welker contacted the police and called for an ambulance.

Officer Richard Tabaka of the Baltimore County Police Department ("BCPD") quickly responded to the scene. Ms. Lobell was still on the living room floor, awaiting medical transport. She gave him a basic description of her assailant. Officer Tabaka secured the scene, taking note of several items on the floor near Ms. Lobell: "a bottle of what appeared to be an alcoholic beverage, a tan shirt, a bag of what appeared to be jewelry," "several spots of what appeared to be blood," and a phone base that had been removed from the kitchen wall.

BCPD forensic examiner Sarah Kersse "photograph[ed] the residence as is without disturbing anything." She took 113 pictures, almost all of the interior of the house, photographing "each room of interest." These included the kitchen, dining room, living room, and Ms. Lobell's bedroom. The photographs of the bedroom showed that containers on Ms. Lobell's dresser in which she kept jewelry were open, even though she always left them closed. They also showed an empty envelope on the dresser. There was no blood on the items in the bedroom, suggesting that Howard had touched them before Ms. Lobell bit him. By contrast, the photographs of the living room and kitchen showed blood on several objects. Ms. Kersse processed the scene "for prints on different surfaces that appear[ed] to be involved in the incident[,]" submitted the fingerprints to the BCPD

Latent Print Unit for examination, and collected physical evidence, including "swabs of different areas of possible blood that were present on the living room floor." She recovered the t-shirt found on the floor near Ms. Lobell and submitted it for testing.

Ms. Lobell was transported to the hospital where she was diagnosed with a fractured left hip. Forensic nurse examiner Lisa Krueger performed a modified Sexual Assault Forensic Examination ("SAFE Exam"). (A complete exam could not be performed due to Ms. Lobell's hip fracture.) Nurse Krueger "collected swabs from the bridge of [Ms. Lobell's] nose and from her upper and bottom lip" and "photographed pictures of a sore that she had in her mouth[.]"

Detective Ryan Anderson of the BCPD Special Victims Team served as the lead investigator on the case. While the crime scene was being processed, he noticed a "control module for [Ms. Lobell's] alert medical bracelet" on the basement floor. It was emitting a beeping sound. Later, Detective Anderson determined that the module functioned as the conduit from Ms. Lobell's medical alert bracelet to the BCFD.

On the day of the attack, Barbara Gillin and her husband were staying at their daughter's house in Rogers Forge, near Ms. Lobell's house. As they were walking their dogs in the afternoon, they were approached by a man who appeared "agitated and aggressive." He was holding a check for $40 and wanted to know where the closest SECU branch was located. The next day, Detective Anderson interviewed Ms. Lobell's neighbors, including Ms. Gillin, and she told him about the man with the check. Detective Anderson found Ms. Lobell's SECU checkbook in her house and saw that it

contained a carbon copy of the check written to Howard. The memo line read "chimney repair."

Timothy Fitzgerald had lived in the Rogers Forge vicinity for decades and knew Ms. Lobell. Sometime in the "late afternoon" on the day in question, he was socializing with his neighbors in a common area behind the row houses that included Ms. Lobell's residence when he saw a man walk down an alley and approach a gate to Ms. Lang's backyard. The man could not open the gate. He then turned and walked to Ms. Lobell's back door. Mr. Fitzgerald saw the man approach Ms. Lobell's back door and "sa[y] something into the house." From a photo array, Mr. Fitzgerald identified Howard as the man he had seen approach Ms. Lobell's house.

Howard was arrested on April 30, 2014. Detective Anderson collected buccal swabs from him and submitted them to the BCPD crime lab for testing. Rebecca Schlisserman, a forensic biologist with the crime lab, processed the items recovered by Ms. Kersse. She forwarded select samples of those items, the DNA sample taken from the bridge of Ms. Lobell's nose during the SAFE Exam, and the buccal swabs taken from Howard to a private DNA testing laboratory. Testing revealed that samples taken from the t-shirt recovered from Ms. Lobell's living room floor and blood stains from her living room carpet matched Howard's DNA. The State presented evidence showing that Howard's fingerprint was on the empty envelope on the dresser in Ms. Lobell's bedroom.

The defense rested without putting on any evidence. Defense counsel did not dispute that Howard was present in Ms. Lobell's house on the day in question, but took the position that the State's evidence did not prove the elements of the crimes charged.

We shall include additional facts as pertinent to the issues.

## DISCUSSION

### I.

### A.

After spending several days in the hospital and a month in a rehabilitation facility, Ms. Lobell moved back to her house in Rogers Forge ("the House"). She was living there, on her own, in April 2015, when the case against Howard went to trial. By then she was 99 years old.

Before trial, on November 11, 2014, Howard's lawyers asked the prosecutor assigned to the case to allow them to inspect the interior of the House. The prosecutor responded that Ms. Lobell and her son, whose name was on the title to the House, would not agree to such an inspection. On January 9, 2015, defense counsel filed a "Motion To Visit The Crime Scene[,]" arguing that "[t]he scene of the alleged crime is . . . a part of discovery" under Rule 4-263. They sought an order directing "the Baltimore County State's Attorney's Office, and the homeowner of [the House]" to provide a date and time for defense counsel to visit the house for inspection. They asserted that the State's Attorney's Office ("SAO") was obligated under Rule 4-263 to make the House available for inspection and that it would violate Howard's right to due process under the Fourteenth Amendment and his right of confrontation under the Sixth Amendment not to be allowed, through counsel, to inspect the place where the crimes were committed.

At a hearing on the motion, Howard's lawyers repeated these arguments, asserting that there might be "exculpatory things . . . that the State did not provide us within their

photos" and because the State's photographs "are just one point of view" and were taken "for the benefit of the State's case[.]" Also, the photographs did not give "dimension or geography or measurements or anything like that that can help in the Defense's case." Defense counsel asserted that evidence they might find by inspecting the House might be used to "challenge [Ms. Lobell's] credibility[.]" They acknowledged that "there are privacy issues, that [Ms. Lobell] has a right to the privacy of her home[,]" but maintained that the inspection they had proposed "would be so limited in time and so little that [the need to inspect] outweighs [Ms. Lobell's] privacy for the probative value that [defense counsel] can get out of it."[2] Without elaborating, defense counsel argued that the Maryland Rules, the Sixth Amendment rights to effective assistance of counsel and to confront witnesses, and the Fourteenth Amendment right to due process all entitled Howard to inspect the interior of the House, as the crime scene location, even though it was not in the possession or control of the SAO.

The State responded that the court lacked authority to order the requested inspection. It argued that the discovery obligations established in Rule 4-263 do not encompass an inspection of a crime scene location that is in the possession or control of a third party, and defense counsel provided nothing to support their contention that the court had the authority to require the State to provide the defense with such an inspection. The State maintained that the photographs produced in discovery adequately depicted the

---

[2] Defense counsel stated that their inspection of the House would take one-half hour, that they would bring an investigator to take photographs, and that they would want to inspect the kitchen, living room, and dining room, and perhaps the upstairs and downstairs, *i.e.*, the basement.

crime scene and urged the court to reject, as "incredibly speculative[,]" the argument that there might be exculpatory evidence at the House.

In rebuttal, defense counsel acknowledged that he "could find no authority that said that we have the right to enter [Ms. Lobell's] home[,]" but suggested, somewhat inconsistently, that regardless of what the rules provide the court had discretion to order the inspection because the house was "a part of the discovery."

The court framed the issue before it as follows:

> The issue is whether I have the authority to order this relief, and I -- if you look at our civil discovery rules as a kind of a comparison, I know they don't apply, but 2-422 does permit the entry upon designated land or other property in the possession or control of a party upon whom the request is served, and there's an annotation that I just looked at that says non-parties may not be compelled to submit to an inspection of their property. The case cited is *Webb* [*v.*] *Joyce Real Estate, Inc.*, 108 Md. App. 512 [(1996)].
>
> Forget about people's motivations. The issue is whether I can take all or any part of the Maryland authorities on discovery in criminal cases and interpret any of that to mean that I can compel some -- a property owner in this case -- it's slightly even more interesting cause it's apparently not the victim's, it's her -- her son that owns the property -- to -- to give access to their property for the purpose of an inspection in advance of trial. So -- so I think the issue really is narrowly -- it's not motivations, it's just authority. Do I have -- do I have the power to do it. . . .

The court took the matter under advisement, giving the parties an opportunity to supplement their arguments with authority from other jurisdictions. Neither party did so.

In an order entered on January 27, 2015, the court denied defense counsel's motion, explaining:

> Maryland law does not authorize the Court to order a non-party in a criminal action to permit entry upon designated land for the purpose of inspection of that land. While the Maryland Rules are clear that a court may order a property owner to submit to a property inspection in a civil

action, no such authority exits in Maryland's criminal jurisprudence, and in this case, the alleged victim and her family object to granting access.

**B.**

Howard contends the circuit court erred in ruling that it lacked authority to grant the motion to inspect the House, and this error caused the court to further err by failing to exercise any discretion to decide whether an inspection should be permitted. He no longer argues that Rule 4-263 authorizes a circuit court to order either the SAO or a third party in possession or control of real property to make the property available for inspection by the defendant before trial. Indeed, he makes no mention of that rule in his brief. Rather, he takes the position that because "nothing in Maryland law *precludes* a trial court from issuing an order permitting defense counsel to enter private property over objection of the property owner" (emphasis in original), the court has the inherent authority to do so, without any authority by rule or statute. Beyond that, he argues that the right to "'a meaningful opportunity to present a complete defense'" (quoting *Crane v. Kentucky*, 476 U.S. 683, 690 (1986)), as guaranteed by the Due Process Clause of the Fifth Amendment and the Confrontation Clause of the Sixth Amendment, entitles him to inspect the crime scene before trial. He asserts that the circuit court should have exercised its discretion to decide "whether [his] constitutional rights trumped the property rights of Ms. Lobell's family."[3]

---

[3] Howard also argues that because the court has authority to permit a jury view of the crime scene, it must have authority to permit a defendant to inspect the crime scene before trial. Maryland follows "'the general rule . . . that the granting or refusing of a request to allow the jury to view the premises where a crime is alleged to have been

(Continued…)

The State maintains that Rule 4-263 has no application because the SAO's discovery obligations only pertain to property in its possession or control, and the House is private property in the sole possession and control of Ms. Lobell and her son.[4] It further argues that the constitutional rights to confrontation and due process do not apply to pre-trial discovery, except in limited situations not present here. It argues that because there is no statute, rule, or constitutional provision that gives a Maryland circuit court the power, in a criminal case, to order a third party in possession or control of real property that was the scene of the crime to make that property available for inspection by the defense before trial, the circuit court's ruling was legally correct. In the alternative, the State argues that even if the circuit court had the power to grant Howard's motion with

---

(…continued)
committed is within the discretion of the trial court.'" *Waddell v. State*, 65 Md. App. 606, 611 (1985) (quoting *Corens v. State*, 185 Md. 561, 573 (1946)); *see also* 2 *McCormick on Evidence* § 219 (7th ed. 2013) ("[E]ven without express statutory authorization there is an inherent power in the trial judge to order a view by the jury[.]"); 4 *Wigmore on Evidence* § 1163 (1972) (stating a trial "court is empowered to order such a view, in consequence of its ordinary common law function, and *irrespective of statutes* conferring express power" (emphasis in original)). An inspection of a crime scene before trial and a jury view of a crime scene during trial are not comparable, because a jury view is not an aspect of discovery or pre-trial procedure.

[4] In the State's view, subsection (g)(1)(b) of Rule 4-263 creates a "catch-all" entitlement to discovery not otherwise covered by the rule, when constitutionally required and upon a showing of an adequate need. Whether the language can be read that way is highly questionable but does not matter because the subsection does not apply here as the rule as a whole does not apply to non-parties such as Ms. Lobell and her son.

respect to Ms. Lobell and her son, it correctly denied the motion because Howard failed to "make a sufficient showing of need."[5]

## C.

Rule 4-263 "governs discovery and inspection in a circuit court" criminal case. The State's required discovery disclosures are listed in subsection (d) of the rule. The SAO must disclose "material and information" required by subsection (d) that is in the SAO's "possession or control," including in the possession or control of the "attorney, members of the attorney's staff, or any other person who either reports regularly to the attorney's office or has reported to the attorney's office in regard to the particular case." *Id.* at §§ (c)(1) and (c)(2), respectively. The required discovery disclosures include "[e]vidence for use at trial." Md. Rule 4-263(d)(9). That subsection provides that the SAO must give the defense "[t]he opportunity to inspect, copy, and photograph all documents, computer-generated evidence . . . recordings, photographs, *or other tangible things* that the [SAO] intends to use at a hearing or at trial[.]" *Id.* (emphasis added).

It is undisputed that the SAO was not in possession or control of the House. For that reason alone, even if the House were a "tangible thing" within the meaning of subsection (d)(9), the State would not be obligated to produce it for inspection. Given the clarity of the rule respecting the scope of the parties' discovery obligations, it is not

---

[5] The State also argues that if the court erred its error was harmless, and if not harmless the appropriate remedy is a limited remand to allow the trial court to balance Howard's right to mount a defense against Ms. Lobell's privacy interests. Because we hold that the court did not err, we need not reach those arguments.

surprising that Howard no longer argues that Rule 4-263 authorized the circuit court to issue an order compelling the State to make the House available for inspection.

Relatedly, Rule 4-263 pertains only to the parties to a circuit court criminal case. Ms. Lobell and her son are not parties. Rule 4-264, which was not invoked and is not mentioned by either party in their briefs, governs production and inspection by non-parties prior to trial. Under that rule, on motion of a party, the court may order that a subpoena be issued "commanding *a person* to produce for inspection and copying at a specified time and place *before trial* designated documents, recordings, photographs, *or other tangible things*, not privileged, which may constitute or contain evidence relevant to the action." Md. Rule 4-264 (emphasis added). If the House were a "tangible thing," Ms. Lobell and her son could have been compelled to produce it for inspection by the defense, had the court exercised its discretion to do so. The House is not a "tangible thing," however.

The phrase "other tangible things" appears in Rule 4-264 and, as noted, in Rule 4-263. It stands in contrast to the language of Rule 2-422, which permits party discovery of "documents, electronically stored information, and property" in civil cases. In that rule, in addition to allowing each party to serve a request for production of "designated tangible things[,]" *id*. at (a)(1), each party may serve a request "*to permit entry upon designated land* . . . in the possession or control of the party upon whom the request is served for the purpose of inspection [and other purposes that are specified]." *Id*. at (a)(2) (emphasis added). Thus, Rule 2-422(a) draws a distinction between "tangible things" and "land." The language in Rule 4-263(d)(9) also stands in contrast to Federal Rule of

-13-

Criminal Procedure 16, which in some circumstances requires the government to permit the defendant to inspect "documents and objects," and specifies that "documents and objects" include "tangible objects" *and* "buildings or places[.]" Fed. R. Crim. Proc. 16(a)(1)(E). This language also draws a distinction between tangible things and buildings. The phrase "other tangible things" in Rule 4-263(d)(9) and in Rule 4-264 cannot reasonably be read to include "buildings" or "land."[6]

As mentioned above, Howard takes the position that because there is no statute or rule that *precludes* the circuit court from issuing an order permitting an accused to inspect a building where the crime took place, the court has the inherent power to do so, regardless of who has possession or control of the building. In other words, the court has the inherent power to grant pre-trial discovery to a defendant in a criminal case so long as that power is not expressly negated by statute or rule. This argument is at odds with long-established Maryland common law.

In *Goldsmith v. State*, 337 Md. 112 (1995), a defendant charged with child sexual abuse sought, under Rule 4-264, to obtain pre-trial discovery of the victim's psychotherapy records. The circuit court denied the motion on the ground that the records were privileged, and Rule 4-264 excludes privileged documents. The case reached the Court of Appeals, which explained at the outset of its analysis that, "[a]t common law, a criminal defendant had no right to pre-trial discovery." 337 Md. at 121

---

[6] Federal Rule of Criminal Procedure 16(a)(1)(e) requires that the item be "within the government's possession, custody, or control" and that it be either "material to preparing the defense[,]" an item the government intends to use in its case-in-chief, or an item that was "obtained from or belongs to the defendant."

(citing *State v. Haas*, 188 Md. 63, 69 (1947), *overruled on other grounds*, *In re Petition for Writ of Prohibition*, 312 Md. 280, 305 (1988)). "'American courts, relying on the English precedent, adopted a common law rule holding that the judiciary lacked any inherent authority to order pretrial discovery in criminal cases.'" *Id.* (citing and quoting Wayne R. LaFave & Jerold H. Israel, *Criminal Procedure* § 20.1 at 836 (2d ed. 1992)). The Court continued:

> Over time, we have expanded the common law and given the trial courts some authority to either require or permit discovery. Nevertheless, the right to pre-trial discovery is strictly limited to that which is permitted by statute or court rule or mandated by constitutional guarantees. We therefore must look to our statutes, court rules, and constitutional requirements to determine the propriety of the defendant's right to pre-trial discovery.

*Id*. at 122 (citations omitted).[7]

The Court agreed with the circuit court that the plain language of Rule 4-264 did not permit a defendant to obtain pre-trial discovery of privileged material in the hands of a third party. As no statute governed the request, the Court considered whether the

---

[7] Maryland first permitted pretrial discovery in criminal cases in July 1951, when the Court of Appeals adopted the Maryland Criminal Rules of Practice and Procedure. Rule 5 of those rules, the predecessor to Rule 4-263, stated in its entirety:

> Discovery and Inspection. Upon motion of a defendant, the court, in any case pending before it, may order the State's Attorney to permit the defendant to inspect and copy or photograph designated books, papers, documents, or tangible objects, including written statements by the defendant, obtained from or belonging to the defendant or obtained from others by seizure or by process upon a showing that the items sought may be material to the preparation of his defense and that the request is reasonable.

defendant had any constitutional right to obtain, pre-trial, psychological records of the victim. After reviewing pertinent case law, it concluded that "[n]either due process, compulsory process nor the right to confront adverse witnesses establishes a pre-trial right of a defendant to discovery review of a potential witness's privileged psychotherapy records." *Id.* at 127. "Thus, we find no common law, court rule, statutory or constitutional requirement that a defendant be permitted pre-trial discovery of privileged records held by a third party." *Id.*

For purposes of this portion of our discussion, the significance of *Goldsmith* is that it makes clear that in a criminal case, the circuit court does *not* have inherent authority to grant pre-trial discovery so long as it is not precluded. Contrary to the argument Howard advances, in a criminal case discovery only may be obtained when permitted by the common law, by statute, or by court rule, or when it is constitutionally necessary. *See also Cole v. State*, 378 Md. 42, 57–58 (2003) ("trial judges have no power beyond that conferred by Rule 4-263 to order discovery of tangible evidence or documents in the State's possession[,]" and "'the right to pre-trial discovery is strictly limited to that which is permitted by statute or court rule or mandated by constitutional guarantees'" (quoting *Tharp v. State*, 362 Md. 77, 115 (2000)).[8]

---

[8] There was a time when the "Criminal Rules of Practice and Procedure" made reference to an inherent authority of the court with respect to discovery. In 1956, Rule 5 was reorganized and moved to Chapter 700 of the Maryland Rules of Procedure, as Rule 728. Effective January 1, 1962, the section in which Rule 728 was included was "completely rewritten" and the rule was revised. *Jennings v.* State, 303 Md. 72, 80 (1985). As revised, Rule 728 included section (c), entitled "Common Law Discovery Preserved[,]" which stated, "Nothing in this Rule shall limit the inherent common law
(Continued…)

*Goldsmith*, *Cole*, and *Tharp* (holding that trial judges have no authority beyond what is permitted by Rule 4-261 to order depositions in criminal cases) also undercut Howard's attempt to analogize this case to civil actions in which we have recognized that a circuit court may grant an equitable bill of discovery to compel a non-party to open his property for inspection before trial.

In *Johnson v. Franklin*, 223 Md. App. 273 (2015), and *Stokes v. 835 N. Washington Street, LLC*, 141 Md. App. 214 (2001), we held that a circuit court may grant an equitable bill of discovery to compel the present owner of a building to make it accessible to the plaintiff in a lead paint case against the former owner of the building to perform non-destructive tests for the presence of lead paint. Recognizing that there is no civil discovery rule authorizing a court to compel a third party to open his real property for inspection, *see Webb v. Joyce Real Estate, Inc.*, 108 Md. App. 512 (1996), we explained that the circuit court has inherent authority to do so through an equitable bill of discovery "when it is in the interest of justice[.]" *Stokes*, 141 Md. App. at 223. To obtain an equitable bill of discovery, a party must prove by a preponderance of the evidence that the information the party is seeking to discover is material and necessary; that the party has no other adequate means to obtain that information; that the party's right of access to

_____

(…continued)
power of the court to require or permit discovery." A later version of that rule changed the title of section (c) to "Inherent Power of Court Preserved" and removed the phrase "common law." In mid-1975, the Maryland Standing Committee on Rules of Practice and Procedures ("Rules Committee") recommended in its Fifty-Third Report to the Court of Appeals an expanded version of Rule 728, to be renumbered Rule 741, that no longer contained section (c). The Court of Appeals adopted that revision, which went into effect on July 1, 1977.

the premises outweighs the privacy right of the owners and the occupants of the property; and that issuance of an equitable bill of discovery will not impose an unreasonable hardship upon the owner or any occupant of the premises. *Johnson,* 223 Md. App. at 288.

An equitable bill of discovery is "'a procedural tool in use for centuries'" that "allows a litigant to obtain information that is in the exclusive possession of another person and is necessary to the establishment of the litigant's case." 223 Md. App. at 281 (quoting *Estate of Bochiccho v. Quinn*, 136 Conn. App. 359 (2012). Long before discovery rules were adopted for civil cases, the equitable bill of discovery served as a remedy that, "'when used as an auxiliary process in aid of trials at law,'" allowed a litigant to gather evidence necessary to prove his cause of action. *Id.* (quoting *Pottetti v. Clifford*, 146 Conn. 252, 258 (1959)). Thus, as we explained in *Stokes*, the equitable bill of discovery still exists for use in civil cases because in those cases the circuit court has inherent authority to order discovery, beyond what is permitted by the discovery rules. 141 Md. App. at 226. This stands in direct contrast to discovery in criminal cases, where the common law did not provide for discovery at all, and there is no inherent authority on the part of the court to order discovery.

In the case at bar, there is no statute or rule, and nothing in the common law, that authorized the circuit court to issue an order directing Ms. Lobell and her son to make the House available to Howard's lawyers for inspection before trial. That leaves Howard with the sole argument that such an order was necessary to protect his constitutional rights. The argument he makes is meager, to say the least. He identifies the constitutional

-18-

right at stake as that to "'a meaningful opportunity to present a complete defense.'" Appellant's Brief at 8 (quoting *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (in turn quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984))). He quotes *Crane* as observing that such a right is guaranteed to a criminal defendant, "[w]hether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation Clauses of the Sixth Amendment[.]" 476 U. S. at 690 (internal citations omitted). That is the sum and substance of his constitutional argument.

Courts in a number of other states have faced the question whether a trial court has authority to allow a defendant in a criminal case to inspect the location of the crime when it is a private residence that is not in the possession or control of the State. In one of the earlier cases to address the issue, *Henshaw v. Commonwealth*, 19 Va. App. 338 (1994), the defendant, charged with voluntary manslaughter, moved to inspect the house in which the crime was perpetrated, which was in the possession and control of a third party. The motion was denied on the ground that the court lacked authority to grant it, as no statute or rule allowed for such discovery. The Virginia Court of Appeals held that the trial court has authority to grant such a motion to protect a defendant's right to due process under Virginia's constitution, so long as the defendant shows a substantial basis for the inspection and provided the owner or possessor of the property has not rebutted that showing with a showing that his constitutional right to privacy outweighs the accused's right to view or inspect. The court did not reverse the conviction, however, because it concluded that the trial court's error in denying the motion was harmless.

In *Commonwealth v. Matis*, 446 Mass. 632 (2006), the defendant was charged with raping a 15-year-old girl in the early morning hours, in the living room of her parents' very small house, when six or seven other people were present. His defense was that the crime did not happen and that others in the house would have been aware if it had. Before trial, the defense moved to inspect the house in order to measure and photograph the rooms. The court granted the motion, and the Commonwealth noted an interlocutory appeal. The Supreme Judicial Court of Massachusetts broadly interpreted one of its discovery rules to allow a trial court to order an inspection of a private residence that was the location of the crime so as to protect the defendant's rights, under the Sixth Amendment and the Massachusetts Declaration of Rights, to obtain relevant evidence bearing on guilt or innocence or otherwise helpful to the defense. It was implicit in the court's decision that the defense had made a satisfactory threshold showing of need. The court vacated the trial court's order, however, because the owners of the house had not been given an opportunity to be heard. The case was remanded for a hearing in which they could participate.

More recently, in a case factually similar to *Matis*, the Supreme Court of New Jersey held that a trial court did not abuse its discretion in granting a pretrial motion by a juvenile respondent to inspect the private residence where the alleged wrongful act had been committed. In *State in Interest of A.B.*, 219 N. J. 542 (2014), the 17 year old juvenile was charged with sexually abusing his six year old cousin, at the home of her parents (the juvenile's aunt and uncle). The abuse was alleged to have taken place on the Fourth of July, when there was a gathering of people at the house for a cookout. Counsel

for the juvenile moved for a pre-trial inspection of the aunt and uncle's house, on the ground that it was essential to the juvenile's defense for counsel to have a "spatial understanding of the layout of the rooms and an opportunity to take photographs[.]" *Id.* at 551. The trial court granted the motion, and the State noted an interlocutory appeal.

The case reached the Supreme Court of New Jersey, which did not have to wrestle with the question whether the trial court had the authority to grant the motion, but only with the standard to be applied by the court in exercising its discretion to do so. Unlike in Maryland, it is established law in New Jersey that a trial court has "the inherent power to order discovery when justice requires[.]" *Id.* at 552. The court explained that when a defendant in a criminal case seeks discovery beyond that provided by the automatic discovery rule, he bears the burden of establishing need. Specifically, with respect to a motion "to inspect the crime scene that is an alleged victim's home[,]" the defendant must "articulat[e] a reasonable basis to believe the inspection will lead to relevant evidence on a material issue[.]" *Id.* at 562. If he does so, "then, subject to appropriate time, place, and manner restrictions intended to protect the privacy interests of the alleged victim and her family, the discovery should be granted." *Id.*

The court held that the trial court had not abused its discretion in assessing the need for the inspection and imposing restrictions that would protect the privacy interests of the victim's family. The inspection was necessary to advance the juvenile's defense that "it was not possible for the acts alleged by [the victim] to have occurred undetected by any of the five adults" present at the relevant time. *Id.* at 563. The State had provided photographs, but they did not show the proximity of the victim's bedroom, where the

sexual act was alleged to have been perpetrated, to the kitchen and the patio and pool area, where other people were gathered. The inspection was to be limited to 30 minutes, the victim was not required to be present or to know of it, only the victim's bedroom and the juvenile's sleeping area were to be inspected, the juvenile's parents were barred from participating, and a representative of the prosecutor's office was to be present. The court concluded that these restrictions protected the rights of the victim and her family and thus struck a fair balance.

By contrast, even more recently, the Supreme Court of Colorado held that the trial courts in that state do not have any authority to grant discovery in criminal cases beyond that which is expressly permitted by statute or rule and that no constitutional right entitles a defendant in such a case to inspect a crime location that is a private residence not in the possession or control of the State. In *People in the Interest of E.G.*, 368 P.3d 946 (Colo. 2016), a juvenile was charged with offenses arising out of the sexual abuse of his younger twin cousins. The abuse was alleged to have taken place in the basement of their mutual grandmother's house. Before trial, defense counsel filed a motion seeking an order directing the grandmother to make her house available for inspection and photographing. The court denied the motion on the ground that it had no authority to grant it. The juvenile was convicted of two counts of sexual assault on a child.

On appeal, the juvenile challenged the lower court's denial of the motion for inspection. The Colorado Court of Appeals concluded that "concepts of fundamental fairness and due process" authorized the trial court to grant such a request, but affirmed the convictions because the juvenile had failed to demonstrate that "his inspection of the

crime scene would yield relevant material evidence necessary to present his defense[.]" *People in Interest of E.G.*, 371 P.3d 693, 697 (Colo. App. 2015).

The Supreme Court of Colorado took the case and affirmed, but on the ground that the trial court correctly ruled that it had no authority to order the grandmother to open her residence for inspection by the defense. The court observed that "Colorado remains one of the few states that has never deviated from the traditional doctrine" against trial courts having "freestanding authority to grant discovery in criminal cases beyond what is authorized by the Constitution, the rules, or by statute[.]" *E.G.*, 368 P.3d at 949-50 (footnote omitted). It concluded that Colorado's general discovery rule, which requires the State to make available to the defense, without request, evidence favorable to the defense that is in the possession or control of the State, comports with the due process requirements established in *Brady v. Maryland*, 373 U.S. 83 (1963), but does not grant the trial court "authority to order access to a private home that is not subject to the court's jurisdiction." *E.G.*, 368 P.3d at 950. Likewise, to the extent Colorado's compulsory process rule, which allows a defendant to obtain a subpoena commanding a witness to attend and give testimony and "'may also command the person . . . to produce . . . books, papers, documents, photographs, or other objects[,]'" *id*. at 951 (quoting Colorado Criminal Procedure 17(a)(c)), permits the defense to obtain such materials pretrial, it does not permit access to a private home, which is not an "object."

The court went on to address and reject the constitutional arguments made by the juvenile. It reasoned that the Compulsory Process and Confrontation clauses of the Sixth Amendment embody trial rights, not pretrial discovery rights, and that due process of law

-23-

does not give a criminal defendant the "constitutional right to force a third party to open her private home for an investigation." *Id.* at 954. The court held that under no circumstance could a third party owner/possessor of residential property's Fourth Amendment "right to be free from an unreasonable search of her home conducted by the defense" be outweighed by the accused's right to present a defense upon the state action of a court order. *Id.* at 949. The court emphasized that the due process right of access to favorable evidence only pertains to evidence in the possession or control of the State. It concluded that the Due Process Clause does not grant a right to discovery in criminal matters, *see Weatherford v. Bursey*, 429 U.S. 545, 559 (1977) (under federal law, "[t]here is no general constitutional right to discovery in a criminal case"), including a right to use court-provided "'investigative tools.'" *E.G.*, 368 P.3d at 952 (quoting *People v. Baltazar*, 241 P. 3d 941, 943-44 (Colo. 2010)).

A concurring judge wrote that, in his view, the Due Process Clause of the Fifth, Sixth, and Fourteenth amendments safeguards a defendant's right to a fair trial, which encompasses the right to pretrial access to evidence important to his defense. Relying upon the reasoning of the Virginia Court of Appeals in *Henshaw*, he concluded that if a defendant shows that the proposed inspection of private property that was the location of the crime will produce evidence that is relevant and material to his defense, so as to allow him to "meaningfully defend" against the charges,

> then he or she would be entitled to access the crime scene, subject to such reasonable limitations and restrictions as the court deemed necessary, unless the private citizen's constitutional right to privacy outweighed the defendant's right to view or inspect the premises.

*Id.* at 956.

Several courts have assumed without deciding that to protect a criminal defendant's due process right to access evidence relevant and material to his defense, a trial court has the authority to order a third party to open his home for inspection by a criminal defendant, when the home was the crime scene location, but have held that the defendant did not make a threshold showing of need that would justify the court's exercise of that authority.

In *Bullen v. Superior Court*, 204 Cal. App. 3d 22 (1988), for example, the victim was murdered in the house in which he lived with his wife. Investigating police officers took sixty-one photographs of the crime scene. These, along with four detailed diagrams of the house and fifteen pages of reports about the police investigation of the crime scene, were provided to the defense. The defense moved the court for an order compelling the victim's widow to open her house to defense counsel for further investigation. She opposed the motion on the ground that the order "would constitute 'a profound personal violation and an intimidating invasion of [her] privacy[.]'" *Id.* at 24.

The trial court issued a pretrial order directing the widow to open her house for inspection by defense counsel. The widow took an interlocutory appeal, seeking to have the order vacated. The appellate court noted that it did not have to address whether the trial court had jurisdiction to order an inspection of the widow's house, because even assuming it did, the defendant had not made an adequate showing of need for the inspection. To support the request for inspection, defense counsel had stated that it was "'necessary to view the scene of the crime, observe spatial distance, investigate possible

defense theories and to generally prepare examination and cross-examination of key witnesses.'" *Id*. at 27. Finding that this request was "conclusional and thus inadequate to support judicially compelled access to [the widow's] home with the resulting deprivation of her right to privacy in and freedom from unwanted intrusion into her home[,]" the appellate court directed the trial court to vacate its order. *Id.*

Likewise, in *People v. Poole*, 123 Ill. App. 3d 375 (1984), the court found it unnecessary to decide whether the trial court had authority to enter an order compelling the owner of a house where a burglary was committed to open it for inspection by the defense. The burglary was perpetrated in the early morning hours, in a one story house when the four family members were asleep in bed. The intruder entered the bedroom of a ten year old girl and rubbed her arm, waking her. When he attempted to place a towel around her head, she kicked him and ran from the room screaming. The other family members awoke but the burglar was able to escape without being seen. The girl described the intruder to the police and identified him in a photo array. Family members described the size and layout of the rooms in the house and that the girl's bedroom "picked up light from the fluorescent lighting in the bathroom across the hall and from an outside streetlight and parking lot vapor light." *Id*. at 377.

Before trial, the defendant sought an order compelling access to the daughter's bedroom in order to take photographs at night. Defense counsel argued that "the express reason he wanted the photographs was so the jury could make the determination of whether there was sufficient lighting in order for a witness to make an identification." *Id.* at 378. The prosecutor responded that it would be nearly impossible to replicate the

lighting conditions that existed at the time of the burglary, and therefore any photographs would be misleading. The trial court denied the motion on the ground that it lacked authority to order a third party to make his residence available for inspection. The defendant was convicted and appealed, challenging this ruling. The appellate court affirmed, holding that the defense did not make a showing that a photograph could be taken that would depict the nighttime lighting conditions at the time of the burglary, and any photograph that did not accurately depict those conditions would be misleading and therefore not admissible. Thus, even if the trial court had the authority to compel the family to make its house available for inspection, the defendant did not make a threshold showing of need.

Finally, in *State v. Muscari*, 174 Vt. 101 (2002), the defendant was charged with crimes stemming from a violent attack on his ex-girlfriend, in her home. When the police were called, they took extensive photographs of the interior of the house. The defendant filed a pretrial motion to inspect and photograph the house, arguing that because the police were permitted to photograph it, he should be too. By the time the motion came on for a hearing, the ex-girlfriend had moved and the house was occupied by another third party. The trial court denied the motion. The defendant was convicted and appealed, arguing among other things that the trial court's ruling was in error.

Without addressing whether the trial court had authority to order a third party to open her home for inspection by a defendant charged with crimes committed there, and simply assuming that it did, the court commented that "[a] defendant's need for access to a crime scene controlled by a private third party must be balanced against the property

-27-

occupant's right to privacy[,]" and that that balance ordinarily is struck by first "requiring a defendant to make some showing that the requested intrusion is relevant and material to the defense." *Id*. at 114. The court concluded that the defendant had not satisfied that burden, as he "offered no reason or justification why the court should order the occupants to allow him to enter their home." *Id.* Indeed, even on appeal, counsel for the defendant "ha[d] not indicated what information [the defense] hoped to gain from access." *Id*. at 115.

We return to the case at bar. As we have explained, Maryland has no rule or statute in criminal cases authorizing a circuit court to order a third party in possession or control of real property that was the location of a crime to open the property for inspection by the defendant before trial. The Sixth Amendment Compulsory Process and Confrontation clauses, mentioned in passing in Howard's brief, are trial rights, not pre-trial discovery rights. *See Goldsmith*, 337 Md. at 123-27 (that the Confrontation Clause, and the related right of Compulsory Process, do not establish a right to pre-trial discovery) (citing *Zaal v. State*, 326 Md. 54, 67 n.6 (1992)). Whether the Due Process Clause of the Fourteenth Amendment entitles a criminal defendant to obtain, pre-trial, evidence relevant and material to his defense that is not in the possession or control of the SAO is a complex issue that, like the others, Howard mentions but does not argue with any substance. Fortunately, we need not decide it. We agree with those courts that have held that, assuming without deciding that the Due Process Clause guarantees a criminal defendant the right to obtain such evidence before trial, the right nevertheless is predicated on a showing of need. Thus, before a trial court may exercise discretion to

compel a third party in possession or control of real property to make it available for inspection pre-trial by the defense in a criminal case, the defendant must show that he needs to make such an inspection to obtain material relevant and material to his defense. And, once that showing of need is made, the court must balance that need against the privacy interests of the third party.

In this case, it is clear that even if the trial court could compel Ms. Lobell and her son to make the House available for inspection by Howard's counsel, in order to protect Howard's due process rights, Howard did not make a basic threshold showing that he needed to inspect the House to obtain relevant and material evidence in his defense. Defense counsel's motion to inspect the House and their oral argument on the motion gave three reasons in support. First, the "evidence" from an inspection "could be . . . exculpatory in nature, and useful for impeachment purposes[,] especially in light or [sic] the discovery of inconsistent statements by Ms. Lobell." This is conclusory. It says nothing about why an inspection of the House months after the crime was committed would be expected to produce exculpatory evidence and, most significantly, what that exculpatory evidence might be. Nor does it describe the supposedly inconsistent statements by Ms. Lobell, or explain how they relate to anything that would be learned from an inspection of the House at all, or that the existing crime scene photographs do not show anyway.

Second, defense counsel asserted that the 113 crime scene photographs were "not enough" because they do not "allow a viewer a proper sense of dimensions, or space, or distance, or geography." This also is conclusory. How are the crime scene photographs

inadequate?  What do they not show that is important for the defense to see?  What might the defense expect to learn about the dimensions of the rooms and their spatial relationships to each other that the crime scene photographs do not show and that is significant and would tend to support Howard's defense?  In *Matis* and *A.B.*, the layout of the home in which the crime was alleged to have been committed was integral to the defense that the crime was not perpetrated at all, because it could not have been committed without being heard or seen by others.  By contrast, here, the layout of the House is not material to any defense Howard offered.  Indeed, Howard's only defense was that the State did not adequately prove the elements of the crimes.  He did not maintain that the layout of the House in some way showed that the crimes could not have been perpetrated by him, or at all, or as described by Ms. Lobell or that the crimes would have been witnessed or heard by others.

Third, and last, defense counsel complained of inherent bias in the mere fact that the BCPD, not people assisting the defense, gathered the evidence at the crime scene and took the crime scene photographs.  They argued that those photographs were taken "with the sole intent to help the State in preparing their case, not the Defendant's case[,]" and that Howard needs photographs taken from a "point of view" that will assist in his defense.

This argument lacks substance and borders on the nonsensical.   Crime scene photographs always are taken by first responders, and here, when they were taken, right after the police arrived at the House, Howard was not even a known suspect.  Howard does not say what it is about the crime scene photographs that leads him to believe they

were taken from a "point of view" that would advance the prosecution and detract from his defense. He ignores the fact that when defense counsel moved to inspect the House, six months had passed since the crime and Ms. Lobell had moved back in. Obviously, by then the crime scene no longer existed. The House existed as a crime location but not as a crime scene. To the extent defense counsel were unhappy with the way the evidence was photographed by the police—and they have given nothing to justify such a reaction—the evidence could not be re-photographed.

Howard failed to make a threshold showing of a need to inspect the House to obtain evidence that was relevant and material to his defense. Accordingly, even if the trial court had authority to order Ms. Lobell and her son to make the House available for inspection by the defense before trial, the court would have abused its discretion by exercising that authority to issue such an order.

## II.

The prosecutor planned to call BCPD Officer Denise Wallace, an expert in the field of latent fingerprint examination, to testify that she had examined a fingerprint lifted from an envelope in Ms. Lobell's bedroom, had compared it to Howard's fingerprint in the BCPD database, and had confirmed that the fingerprints matched.

The day before Officer Wallace was scheduled to testify, defense counsel moved to preclude her from making mention of the "known prints" in the BCPD database. They argued that any reference to "known prints" would signal to the jury that Howard had a criminal history. In response, the prosecutor offered to have Officer Wallace roll Howard's fingerprints in court, outside the presence of the jury, and then compare those

fingerprints to the fingerprint lifted from the envelope in Ms. Lobell's bedroom. Defense counsel agreed. Howard's fingerprints were rolled in court. The court directed the prosecutor to instruct Officer Wallace "that there's to be no overt or even indirect references to prior arrests [or] the genesis of these known prints[.]"

The next day, Officer Wallace's testimony went as follows:

[THE STATE]: So the latent . . . print card, the known prints that you had of [Howard] that you compared it to, did you have an opportunity to actually see [Howard's] prints be rolled?

[WALLACE]: Not at the time, no.

[THE STATE]: Not at the time. Okay.
    The -- at that time, the card that you had, then you were just told that it belonged to [Howard], is that correct?

[DEFENSE COUNSEL]: Objection.

THE COURT: Overruled.

[WALLACE]: The card that I received, *I received it from an archive file that we have* --

[DEFENSE COUNSEL]: Objection.

[THE STATE]: Okay. And that -- from that file, did you -- did you see that those prints came from [Howard]?

[WALLACE]: Yes.

[THE STATE]: Okay. And did you also have an opportunity to observe those prints and identify --

[DEFENSE COUNSEL]: Objection. Your Honor, may we approach?

[THE STATE]: -- observe [Howard] being printed?

-32-

[THE COURT]: Yes.[9]

(Emphasis added.)

At the bench, defense counsel moved for a mistrial or to strike Officer Wallace's testimony about the "archive file." The court denied both motions, finding that "there [was no] impermissible suggestion that the archived file was a consequence of a prior arrest or conviction."

Howard contends the trial court abused its discretion by denying his motion for a mistrial or to strike Officer Wallace's testimony about the "archive file." He asserts that "[Officer] Wallace's reference to [his] 'archive file' very likely led the jury to infer that [Howard] had a prior criminal record–a fact both irrelevant and unfairly prejudicial[,]" thereby denying him a fair trial. He argues that even if a mistrial were not warranted, the trial court abused its discretion by denying his motion to strike because the reference to an "archive file" violated the prohibition against inadmissible other crimes evidence.

The State responds that the court did not abuse its discretion because Officer Wallace's reference to the "archive file" "did not suggest that the fingerprints that [Officer Wallace] used for comparison were obtained in connection with a criminal case[,]" and Officer Wallace's testimony was admissible and relevant to show that Howard was present at the crime scene. Moreover, any prejudice was diminished by the

_____

[9] We agree with the State that it appears that the prosecutor became "flummoxed" when Officer Wallace testified not about the card bearing the fingerprint that was rolled in court the day before but about the card bearing the fingerprint that she originally used in determining whether the fingerprint was a match for Howard. The prosecutor's use of the past tense in questioning Officer Wallace likely confused her.

overwhelming evidence that he was present at the crime scene. The State argues that because Officer Wallace's testimony was relevant and not unfairly prejudicial, "there was no basis to grant either a motion for mistrial or a motion to strike."

"A mistrial is an extreme remedy and it is well established that the decision whether to grant it is within the sound discretion of the trial court." *Walls v. State*, 228 Md. App. 646, 668 (2016) (citing *Carter v. State*, 366 Md. 574, 589 (2001)). "'In the environment of the trial the trial court is peculiarly in a superior position to judge the effect of any . . . alleged improper remarks.'" *Simmons v. State*, 436 Md. 202, 212 (2013) (quoting *Wilhelm v. State*, 272 Md. 404, 429 (1974)). "[T]he key question for the appellate court is whether the defendant was so prejudiced by the improper reference that he was deprived of a fair trial." *Parker v. State*, 189 Md. App. 474, 494 (2009) (citing *Kosmas v. State*, 316 Md. 587, 594 (1989)).

Officer Wallace complied with the trial court's directive that she not make any "overt or even indirect reference[] to prior arrests [or] the genesis of the[] known prints[.]" Her reference to an "archive file" was ambiguous at best, and would not have suggested to the jury that Howard had a prior criminal record. Indeed, as we noted in *Edmonds v. State*,

> [s]ince fingerprinting is used in numerous branches of business and civil and military service, . . . the fact of fingerprinting cannot, of itself, be deemed a badge of crime or connote the existence of a criminal record, nor would the introduction of such evidence for the limited purpose of comparison with latent fingerprints of an accused found at a crime scene *per se* constitute prejudice or deny the accused his constitutional right to a fair trial.

5 Md. App. 132, 139 (1976) (citations omitted).

Nor did the trial court abuse its discretion by denying Howard's motion to strike Officer Wallace's testimony. Her reference to the "archive file" is not the same as evidence of "an activity or conduct, not necessarily criminal, that tends to impugn or reflect adversely upon one's character, taking into consideration the facts of the underlying lawsuit." *Klauenberg v. State*, 355 Md. 528, 549 (1999). Because an "archived" fingerprint could come from any number of sources, and Officer Wallace's reference would not have been a clear indication that Howard had engaged in past criminal conduct, the trial court acted within its discretion in denying both the motion for mistrial and the motion to strike.

### III.

Howard was charged with the felony of first-degree burglary, in violation of Md. Code (2002, 2012 Repl. Vol., 2014 Supp.), section 6-202 of the Criminal Law Article ("CL"). That statute states that "[a] person may not break and enter the dwelling of another with the intent to commit theft" or "a crime of violence."

The Maryland Pattern Jury Instruction for first-degree burglary includes the following with respect to a "breaking":

> Breaking means the creation or enlargement of an opening, such as breaking or opening a window or pushing open a door. [Breaking includes gaining entry by fraud, trick, or force.]

MPJI-Cr 4:06. In the discussion among the court and counsel about instructions, the prosecutor asked the court to elaborate slightly on the definition of "breaking" in the pattern instruction, to explain that there are two types of breaking and to include the parenthetical above. The trial court agreed, and instructed the jury as follows:

There are two types of breaking: actual breaking and constructive breaking. Actual breaking means the creation of an enlargement or an opening, such as breaking or opening a window or pushing . . . open a door. Constructive breaking means gaining entry by fraud, fraudulent misrepresentation, trick or force.

Howard contends the trial court abused its discretion by giving this modified instruction about "breaking." He argues that the modification "impermissibly amplified the State's theory of guilt" and "effectively tilted the scales in the State's favor." The State responds that the instruction was a correct statement of the law that was generated by the evidence and that "where the instruction was correct, a few sentences that depart from [MPJI-Cr 4:06] in a way that clarifies, rather than confuses, the applicable law can hardly generate error."

We review a trial court's decision to give a requested jury instruction for abuse of discretion. *Hall v. State*, 437 Md. 534, 539 (2014). "[A] trial court must give a requested jury instruction where '(1) the instruction is a correct statement of law; (2) the instruction is applicable to the facts of the case; and (3) the content of the instruction was not fairly covered elsewhere in instructions actually given.'" *Vielot v. State*, 225 Md. App. 492, 505 (2015) (quoting *Dickey v. State*, 404 Md. 187, 197–98 (2008)). "[I]f, taken as a whole, [the court's instructions] correctly state the law, are not misleading, and cover adequately the issues raised by the evidence, the defendant has not been prejudiced and reversal is inappropriate." *Fleming v. State*, 373 Md. 426, 433 (2003).

The modified instruction was a correct statement of the law. In *Hobby v. State*, 436 Md. 526, 556 (2014), the Court of Appeals explained that "[a]ctual breaking" is the "'"unloosing, removing or displacing any covering or fastening of the premises"'" and

"[c]onstructive breaking" is the "'entry gained by artifice, fraud, conspiracy or threat.'" *Id.* (quoting *Jones v. State*, 395 Md. 97, 119 (2006)). Howard complains, however, that without modification the pattern jury instruction would have adequately explained the "breaking" element of first degree burglary; but as modified, the instruction "created a State-friendly instruction when there was absolutely no need to do so."

Howard cites no authority for the proposition that a trial court abuses its discretion by providing a more comprehensive jury instruction than the pattern instruction when the instruction accurately recites the law. The only cases he cites are inapposite. In *Brogden v. State*, 384 Md. 631, 644 (2005), the Court held that the trial court committed reversible error by giving a jury instruction that shifted the burden of proof to the defendant; and in *Gore v. State*, 309 Md. 203, 214 (1987), the Court held that the trial court committed reversible error by giving an instruction that improperly suggested the State's evidence was sufficient to support a conviction. The modified instruction at issue in this case did neither such thing. It accurately described actual and constructive "breaking" in a way that would be most understandable to the jurors. *See Sydnor v. State*, 133 Md. App. 173, 184 (2000) (observing that trial courts should seek "to give the jury the most accurate recitation of the law").

The modified instruction also was generated by the evidence. The State's theory of prosecution was that Howard fraudulently misrepresented himself as a licensed repairman so as to gain entry to Ms. Lobell's house in order to steal from her and commit crimes of violence against her. Ms. Lobell testified that Howard told her that Ms. Lang had hired him to repair her roof, and that he entered her home on the pretext of doing repair work

on her house as well. Detective Anderson testified that he verified with the Maryland Department of Labor, Licensing and Regulation that Howard was not a licensed "salesmen, subcontractor or contractor with the Maryland Home Improvement Commission."

Finally, the instruction was not fairly covered by any other instruction given.

The trial court did not abuse its discretion by giving the modified instruction on breaking.

**IV.**

The State designated Shannon Weitz, a forensic biologist and DNA analyst with Bode Technology, a "private DNA testing laboratory[,]" as an expert witness in the field of DNA analysis. Ms. Weitz examined DNA samples submitted by the BCPD crime lab, including samples taken from a stain from the t-shirt recovered from Ms. Lobell's living room floor, blood on the living room carpet, and Howard's buccal swab. She created a DNA profile for each sample, compared the profiles, and concluded to a reasonable degree of scientific certainty that all three were a match.

Ms. Weitz's findings were documented in a report the SAO provided to defense counsel in discovery, at least six months before trial. The report includes the following "Notes":

1. Testing performed for this case is in compliance with accredited procedures under the laboratory's ISO/IEC 17025 accreditation issued by ASCLD/LAB and ANSI-ASQ National Accreditation Board/FQS. Refer to certificates and scopes of accreditation for certificate numbers ALI-231-T and AT-1672, respectively.

2. The DNA profiles reported in this case were determined by procedures that have been validated according to the standards established in the FBI's Quality Assurance Standards for Forensic DNA Testing Laboratories.

On the second day of trial, moments before Ms. Weitz was to testify, defense counsel moved to exclude her "DNA report" from evidence, arguing that the report's certification did not comport with standards required by Md. Code (1974, 2013 Repl. Vol.), section 10-915 of the Courts and Judicial Proceedings Article ("CJP").[10] Specifically, counsel asserted that the DNA profiles created from the t-shirt, blood stain,

---

[10] At the time of trial, CJP section 10-915 stated, in pertinent part:

(a)(1) In this section the following words have the meanings indicated.

(2) "Deoxyribonucleic acid (DNA)" means the molecules in all cellular forms that contain genetic information in a chemical structure of each individual.

(3) "DNA profile" means an analysis of genetic loci that have been validated according to standards established by:

  (i) The Technical Working Group on DNA Analysis Methods (TWGDAM); or

  (ii) The DNA Advisory Board of the Federal Bureau of Investigation.

(b) In general – A statement from the testing laboratory setting forth that the analysis of genetic loci has been validated by standards established by TWGDAM or the DNA Advisory Board is sufficient to admit a DNA profile under this section.

Effective October 1, 2016, sections (a)(3) and (b) were amended to include admission of DNA profiles validated by standards established by the FBI's Quality Assurance Standards for Forensic DNA Testing Laboratories and the FBI's Quality Assurance Standards for DNA Databasing Laboratories. *See* 2016 Md. Laws 6677, 6680.

and Howard's buccal swab were not validated according to standards established by the Technical Working Group on DNA Analysis Methods ("TWGDAM") or the DNA Advisory Board of the Federal Bureau of Investigation ("FBI"). Defense counsel asked the court to "exclude the report because it is not in compliance with the admissibility standards that [are] required by the statute" and to exclude Ms. Weitz's testimony in its entirety.

The prosecutor countered that CJP section 10-915 is designed "to remove the necessity for a *Frye-Reed* hearing" and is not meant to automatically bar the admissibility of DNA profiles validated according to alternative standards.[11] He asserted that the report had been produced by the State in its initial discovery and defense counsel had not raised the issue of admissibility or requested a *Frye-Reed* hearing. The prosecutor stated that the DNA analysis performed by Ms. Weitz "is generally accepted within the scientific community as a reliable testing procedure," but he was "perfectly willing to have a *Frye-Reed* hearing" if defense counsel desired. Defense counsel did not request a *Frye-Reed* hearing, however.

The court denied defense counsel's motion to exclude Ms. Weitz's report and testimony, finding it "utterly and completely groundless." Ms. Weitz was permitted to

---

[11] "A *Frye-Reed* hearing is conducted in Maryland courts to determine whether expert testimony is admissible." *Carter v. Wallace & Gale Asbestos Settlement Tr.*, 439 Md. 333, 354 n.10 (2014). "The name is derived from two cases, *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923), where th[e] standard of general acceptance in the relevant scientific community was first articulated, and *Reed v. State*, 283 Md. 374 (1978), where we adopted the *Frye* Standard." *Blackwell v. Wyeth*, 408 Md. 575, 577 n.1 (2009) (parallel citations omitted).

opine about her DNA analysis and scientific conclusions. Her report was not offered into evidence.

Howard contends the trial court erred by not holding a *Frye-Reed* hearing to determine whether the analysis Ms. Weitz performed, which was the basis for her opinion that his DNA matched the DNA recovered from the t-shirt and carpet sample, was generally accepted by the relevant scientific community and therefore was admissible. The State counters preliminarily that this issue is not preserved for review. We agree with the State.

In his reply brief, Howard all but concedes that he failed to request a *Frye-Reed* hearing. He asserts, however, that because "the State itself broached the subject when the court considered the defense motion" and "the trial court made clear that in all respects it considered the defense motion to be 'utterly and completely groundless[,]'" the issue was "'decided by the trial court' and therefore preserved." *See* Md. Rule 8-131(a) ("Ordinarily, the appellate court will not decide any . . . issue [other than jurisdiction] unless it plainly appears by the record to have been raised in or decided by the trial court[.]").

The record is clear that the prosecutor's suggestion that the court hold a *Frye-Reed* hearing was made in passing and did not eliminate Howard's obligation to request such a hearing himself. The prosecutor explained that he had learned about the defense motion moments before it was made and focused his opposition on certification grounds. He briefly stated that the State was "willing to have a *Frye-Reed* hearing if [the defense] want[ed]" but asserted that nobody could "with a straight face challenge that the DNA

analysis is [not] generally accepted within the scientific community as a reliable testing procedure." The burden was on the defense to request a *Frye-Reed* hearing. Having failed to do so, Howard cannot complain on appeal that the trial court erred by not holding such a hearing. *See Addison*, 188 Md. App. 168, 181 (2009).[12]

## V.

False imprisonment, a common law crime, is the "'unlawful detention of a person against his will.'" *Street v. State*, 307 Md. 262, 265 (1986) (quoting *Midgett v. State*, 216 Md. 26, 38–39 (1958)) (additional citations omitted). To obtain a conviction, the State must prove that the defendant "confined or detained" the victim against her will; and "that the confinement or detention was accomplished by" force or threat of force or deception. *See* MPJI-Cr 4:13(3).

At the conclusion of the evidence, defense counsel moved for judgment of acquittal, arguing:

> With respect to the false imprisonment . . . I think it's just basically holding somebody in place against their consent. ***I don't know if there was any protestation from [the victim] that she did not want to go from her dining room to the living room.*** I don't even know if -- that sounds like it happened in seconds. I don't really know if there -- if that was anything that was any evidence to substantiate that that was really done.

(Emphasis added.) The motion was denied.

---

[12] Very recently, the Court of Appeals made clear that a DNA analysis conducted in accordance with the FBI's Quality Assurance Standards, as Ms. Weitz's analysis was certified to have been, qualifies for automatic admissibility under CJP section 10-915. *Phillips v. State*, ___ Md. ___, No. 7, September Term, 2016 (filed January 20, 2017). That is true even when the prior version of CJP section 10-915, referencing TWGDAM or the FBI Advisory Board, was in effect. So, Ms. Weitz's analysis was automatically admissible without a *Frye-Reed* hearing.

On appeal, Howard contends the evidence was legally insufficient "to show confinement or detention." The State responds that this issue is not preserved for review because it was not raised or decided below, and, if preserved, it lacks merit.

We agree with the State that the issue is not preserved for review. When a defendant is tried by a jury,

> "appellate review of sufficiency of evidence is available only when the defendant moves for judgment of acquittal at the close of all the evidence and argues precisely the ways in which the evidence is lacking. The issue of sufficiency of the evidence is not preserved when [the defendant]'s motion for judgment of acquittal is on a ground different than that set forth on appeal."

*Mulley v. State*, 228 Md. App. 364, 388 (2016) (emphasis omitted) (alteration in original) (quoting *Anthony v. State*, 117 Md. App. 119, 126 (1997)).

Before the trial court, Howard argued that there was no evidence that Ms. Lobell was detained *against her will*, *i.e.*, that she "did not want to go from her dining room to the living room." That is not the argument he now advances, *i.e.*, that "the evidence was insufficient to show confinement or detention."

Even if the issue were preserved, it lacks merit. We review "'a question regarding the sufficiency of the evidence in a jury trial by asking whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Grimm v. State*, 447 Md. 482, 494–95 (2016) (quoting *Cox v. State*, 421 Md. 630, 656–57 (2011)). "In determining whether evidence was sufficient to support a conviction, an appellate court 'defer[s] to any possible reasonable inferences [that] the trier of fact could have

drawn from the . . . evidence[.]'" *Jones v. State*, 440 Md. 450, 455 (2014) (alteration in original) (quoting *Hobby*, 436 Md. at 538).

The evidence most favorable to the verdict showed that Howard threw Ms. Lobell from her dining room to her living room floor, breaking her hip and leaving her immobile; held her down on the floor; removed her phone from its mounted position on the wall so she could not use it to call for help; threw the medical alert control module down the basement stairs in an (ultimately failed) effort to keep her from contacting help; and searched her home while she was lying on the floor immobile. Under the circumstances, a reasonable juror could conclude that Howard's separate acts of holding Ms. Lobell down and preventing her from contacting help established that she was confined by force and against her will on her living room floor and those acts were legally sufficient for a rational trier of fact to find that Howard was guilty of false imprisonment beyond a reasonable doubt.

## VI.

At sentencing, Howard argued that his convictions for first-degree assault and false imprisonment should merge. Defense counsel pointed out that in closing argument, the prosecutor stated that the "propelling, and picking up [the victim] and the—the throwing her—her on the ground and breaking of her hip . . . creates the detention and then the confinement of her inability to move that creates the false imprisonment[.]" Howard argued that because the false imprisonment and assault were "part of the same acts," "the elements of the false imprisonment were the same and included in the

elements of the first-degree assault." Therefore, under the required evidence test, the sentences must merge. *See Brooks v. State*, 439 Md. 698 (2014).

The State responded that sentences only merge under the required evidence test when the elements of one crime are identical to the elements of another, and one crime (the greater offense) carries an additional element not contained in the other. The elements of false imprisonment and assault are not the same, and therefore merger was not required. The State further argued that the separate acts of holding the victim down, keeping her confined in the living room for hours, and removing the telephone from the wall were "[c]learly distinct from the first-degree assault."

The court ruled:

[T]he false imprisonment conviction in this case was based on distinct acts that occurred sequentially in the -- in the timeline here. After the original first-degree assault, there were independent acts and independent time that elapsed while this -- the victim in this case was being detained against her will. And I find also that the two offenses are distinct from the standpoint -- elementally and they -- and there's certainly no argument -- no legitimate argument here that these are lesser included offenses.
So I will sentence the [d]efendant independently with regard to the first-degree assault charge . . . and the false imprisonment charge.

On appeal, Howard does not renew his argument that his sentence for false imprisonment should have merged under the required evidence test. Instead, he argues that his sentence was illegal and should have merged under the rule of lenity and considerations of fundamental fairness.

-45-

Howard's rule of lenity argument lacks merit.[13]  As we held in *Pair v. State*, the rule of lenity is a product of statutory construction, not applicable to common law crimes such as false imprisonment.  202 Md. App. 617, 642–43 (2011); *see also State v. Johnson*, 442 Md. 211, 218 (2015) (stating the rule of lenity is "'applicable to statutory offenses only'" (quoting *McGrath v. State*, 356 Md. 20, 25 (1999))).[14]

Howard's fundamental fairness argument also lacks merit.  "[T]he principle of fundamental fairness. . . . is a defense that, by itself, rarely is successful in the context of merger."  *Latray v. State*, 221 Md. App. 544, 558 (2015) (citations omitted).  In *Carroll v. State*, 428 Md. 679, 694–95 (2012), the Court explained:

> Fundamental fairness is "[o]ne of the most basic considerations in all our decisions . . . in meting out punishment for a crime." *Monoker* [*v. State*], 321 Md. [214,] 223 [(1990)]; *Khalifa v. State,* 382 Md. 400, 434, (2004) (observing that additional reasons for merger include "historical treatment, judicial decisions which generally hold that offenses merge, and fairness") (quoting *McGrath*[,] 356 Md. [at] 25). In deciding whether fundamental fairness requires merger, we have looked to whether the two crimes are "part and parcel" of one another, such that one crime is "an integral component" of the other. *Monoker*, 321 Md. at 223–24. This

---

[13] "Under the rule of lenity, a court confronted with an otherwise unresolvable ambiguity in a criminal statute that allows for two possible interpretations of the statute will opt for the construction that favors the defendant." *Oglesby v. State*, 441 Md. 673, 681 (2015).  For sentencing purposes, "'where there is no indication that the [General Assembly] intended multiple punishments for the same act, a court will not impose multiple punishments but will . . . merge one offense into the other.'" *State v. Johnson*, 442 Md. 211, 218 (2015) (alteration in original) (quoting *McGrath v. State*, 356 Md. 20, 25 (1999)).

[14] In his reply brief, Howard maintains that because assault is a statutory crime, no longer cognizable under the common law, *see Robinson v. State*, 353 Md. 683, 700 (1999) ("[T]he common law crimes of assault and battery are no longer cognizable in this State."), we may consider merger under the rule of lenity.  Notwithstanding *Robinson*, false imprisonment remains a common law crime under Maryland law.

inquiry is "fact-driven" because it depends on considering the circumstances surrounding a defendant's convictions, not solely the mere elements of the crimes. *Pair*[,] 202 Md. App. [at] 645[.]

(Footnote and parallel citations omitted.)

Howard maintains his sentences must merge because the acts forming the basis for his false imprisonment conviction were "incidental to" the acts supporting his conviction for first-degree assault. He relies on *Hawkins v. State*, 34 Md. App. 82 (1976). In that case we held that the trial court erred by not merging the defendant's convictions for rape and false imprisonment, where the false imprisonment conviction was based on an unlawful confinement committed only to enable the defendant to rape the victim. Merger was required because "[t]o hold otherwise would be to hold that in every case of rape, a conviction for false imprisonment would also be proper." *Id.* at 92.

*Hawkins* is distinguishable. Here, Howard did not falsely imprison the victim long enough to assault her; to the contrary, the assault occurred first in time, followed by the false imprisonment. Indeed, Howard does not contend that the assault conviction should have merged into his conviction for false imprisonment, but the other way around. As noted in *Hawkins*, "confinement after or before" an assault "is committed would preclude the merger." *Id.* Accordingly, the subsequent detention had no bearing on the initial assault.

Moreover, the acts supporting Howard's conviction for false imprisonment were not "part and parcel" or "an integral component" of those forming the basis for his conviction for first-degree assault. After the initial assault—*i.e.*, Howard's "propelling" Ms. Lobell to the floor—he proceeded to hold her down and later left her lying on the

floor with a broken hip, unable to move. Most significantly, he disabled her telephone and tried to disable the medical alert module in an attempt to prevent her from contacting assistance and thus escape confinement. These acts were separate from those supporting the first-degree assault charge. *See Carroll*, 428 Md. at 697 ("One of the principal reasons for rejecting a claim that fundamental fairness requires merger in a given case is that the crimes punish separate wrongdoing." (Citations omitted)).

Howard argues that the basis for his false imprisonment conviction is, at the least, ambiguous because the jury could have reached its verdict based solely on the acts stemming from the first-degree assault; therefore merger is required. He supports this argument by pointing to the prosecutor's statements in summation, where she argued

> [a]nd really the false imprisonment in this particular case is . . . that once h[e] grabs her, once he throws her on the ground, she said, I know immediately my hip is broken. I know it. I've had one before, I know it. And she can't move. She is now immobile. She can't do anything. And she is helpless. She is detained, she is confined, it is against her will and it was through force. That is all you have to find for false imprisonment. . . .

Howard ignores the State's rebuttal closing, in which the prosecutor asserted that "throwing [the victim] to the floor and then getting on top of her confines and detains" her, and that he "detain[ed] her further by taking away her avenue of help" by "ripp[ing] the phone out of the wall[.]" The argument advanced on rebuttal clearly distinguishes the acts supporting separate convictions for assault and false imprisonment.

At any rate, any ambiguity was resolved by the court's instructions. The court properly instructed the jury on the elements of false imprisonment, which require a finding that Howard "confined or detained" the victim; that she was detained "against her

will"; and "that the confinement or detention" was "accomplished by force or threat of force or deception." Indeed, "we presume that juries follow the instructions of trial judges." *Williams v. State*, 137 Md. App. 444, 459 (2001) (citing *Wilson v. State*, 261 Md. 551, 570 (1971)) (additional citations omitted). Thus, to convict Howard for false imprisonment, the jury had to find that Ms. Lobell was detained through "force or threat of force" separate from the initial assault.

## VII.

Alternatively, Howard contends his 35-year consecutive sentence for false imprisonment must be vacated because it amounts to cruel and unusual punishment.

> The Eighth Amendment to the United States Constitution provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishment inflicted." Similarly, Article 25 of the Maryland Declaration of Rights provides "[t]hat excessive bail ought not to be required, nor excessive fines imposed, nor cruel or unusual punishment inflicted, by the Courts of Law." Finally, Article 16 of the Maryland Declaration of Rights provides "[t]hat sanguinary Laws ought to be avoided as far as is consistent with the safety of the State; and no Law to inflict cruel and unusual pains and penalties ought to be made in any case, or at any time, hereafter."

*State v. Stewart*, 368 Md. 26, 31 (2002) (footnote omitted) (alterations in original).

In the absence of a statutory penalty, the punishment for any common law crime, including false imprisonment, "is anything in the discretion of the sentencing judge, provided only that it not be 'cruel or unusual.'" *Walker v. State*, 53 Md. App. 171, 186 (1982) (quoting *Apple v. State*, 190 Md. 661, 668 (1948)); *see also Sharp v. State*, 446 Md. 669, 685 (2016) ("[The] trial court 'may exercise wide discretion in fashioning a defendant's sentence.'") (quoting *McGlone v. State*, 406 Md. 545, 557 (2008)). Indeed,

"[o]nly rarely should a reviewing court interfere in the sentencing decision at all, especially because the sentencing court is virtually always better informed of the particular circumstances." *Thomas v. State*, 333 Md. 84, 97 (1993). We review a trial court's sentence for abuse of discretion. *Sharp*, 446 Md. at 685 (citing *State v. Wilkins*, 393 Md. 269, 279–80 (2006)).

The prohibition against cruel and unusual punishment "encompasses a narrow proportionality principle prohibiting 'grossly disproportionate' sentences." *Stewart*, 368 Md. at 31 (citing *Harmelin v. Michigan*, 501 U.S. 957, 997 (1991) (Kennedy, J., concurring). In other words, a trial court abuses its discretion when a sentence is "truly egregious." *Thomas*, 333 Md. at 97. The Court of Appeals has explained:

> In considering a proportionality challenge, a reviewing court must first determine whether the sentence appears to be grossly disproportionate. In so doing, the court should look to the seriousness of the conduct involved, the seriousness of any relevant past conduct as in the recidivist cases, any articulated purpose supporting the sentence, and the importance of deferring to the legislature and to the sentencing court. *See* [*State v.*] *Davis*, 310 Md. [611,] 631–32 [(1987)] and *Minor* [*v. State*], 313 Md. [573,] 583–84, [(1988)].
> If these considerations do not lead to a suggestion of gross disproportionality, the review is at an end. If the sentence does appear to be grossly disproportionate, the court should engage in a more detailed . . . analysis. It may conduct an intra- and inter-jurisdictional analysis as a vehicle for comparison and as a source of objective standards; it must, however, remember that under principles of federalism, a state legislature may choose to impose a more severe penalty than other states consider appropriate. In order to be unconstitutional, a punishment must be more than very harsh; it must be grossly disproportionate.

*Id.* at 95–96.

Howard has not satisfied the preliminary threshold established in *Thomas*. His conduct plainly was serious in nature. He gained access to the home of a 98-year old

woman by misrepresenting that he could fix her roof; became violent when she asked him to leave, forcing her to the floor and fracturing her hip; held her there against her will and attempted to prevent her from calling for help by dismantling both her phone and medical alert module; went through her personal effects, as evidenced by his fingerprint in an envelope recovered from her bedroom; and threatened to return the next day. As the trial court noted, the victim was "exceedingly vulnerable."

Moreover, the court considered Howard's lengthy criminal record in fashioning an appropriate sentence. Beginning in 1983, Howard had a series of convictions for crimes, including disorderly conduct, malicious destruction of property, theft, and several charges of first-degree burglary, one of which, the State proffered, was perpetrated against a 93-year-old victim. (The charges in that case were dropped because the victim died before trial.) The court concluded that Howard "must be punished more harshly because of the vulnerability of this victim and because of his dreadful criminal record."

Furthermore, the court articulated several reasons for imposing its sentence. The court found that "the concept of rehabilitation plays absolutely no role in my thinking in this case[,]" because Howard's expression of remorse was not "sincere or legitimate[.]" It further noted that "deterren[ce] and punishment are terribly important" and considered the "special vulnerability of [the victim.]" And, we give great deference to the sentencing court, which "is virtually always better informed of the particular circumstances." *Thomas*, 333 Md. at 97. In the absence of a threshold showing that Howard's sentence for false imprisonment was "grossly disproportionate," he has failed to launch a viable Eighth Amendment challenge to the sentence.

**JUDGMENTS OF THE CIRCUIT COURT FOR BALTIMORE COUNTY AFFIRMED. COSTS TO BE PAID BY THE APPELLANT.**